ST. LUKE'S HOSPITAL, Plaintiff,

v.

SECRETARY OF HEALTH AND HUMAN SERVICES, Defendant.

Civ. No. 84–1506–Y.

United States District Court, D. Massachusetts.

April 15, 1986.

Mitchell H. Kaplan, Choate, Hall & Stewart, Boston, Mass., for plaintiff.

Ralph A. Child, Asst. U.S. Atty., for defendant.

## MEMORANDUM AND ORDER

YOUNG, District Judge.

This action was brought by St. Luke's Hospital ("St. Luke's") to obtain judicial review of a final decision of the Deputy Administrator of the Health Care Financing Administration (the "Deputy Administrator") acting pursuant to a delegation of authority from the Secretary of Health and Human Services (the "Secretary"). The Deputy Administrator denied St. Luke's request for reimbursement of certain costs incurred in fiscal years 1978 and 1979.[1] St. Luke's contends that this action was arbitrary and capricious, and based on certain erroneous conclusions of law. Now before the Court are the parties' cross motions for summary judgment. The parties agree that there exist no disputed issues of material fact and that one of them is entitled to judgment as matter of law. *See* Rule 56, Fed.R.Civ.P.

### I. Background

The Medicare program subsidizes the medical care of eligible disabled and elderly citizens. Among other things, Medicare provides payments to qualified hospitals to reimburse them for medical care provided to Medicare beneficiaries. A hospital may participate in the Medicare program as a "provider of services" by entering into a "provider agreement" with the Secretary. 42 U.S.C. §§ 1395x(e) and (u). The hospital then becomes entitled to payment of the lesser of the "reasonable cost" or the "customary charge" of hospital services provided to Medicare beneficiaries. 42 U.S.C. § 1395f(b). A provider of services receives its Medicare payments from the Secretary, or through a "fiscal intermediary" which acts as an agent of the Secretary for the purpose of reviewing the provider's claim for reimbursement.

The process by which the final amount of reimbursement is determined is quite complex and, as this case aptly demonstrates, it can take years to resolve a dispute between the Secretary and a provider. The payment process begins when the provider files a cost report with its fiscal intermediary. This report sets forth the costs of all services provided to Medicare patients during the year. After the fiscal intermediary analyzes and audits the cost report, it issues the provider a Notice of Program Reimbursement, which sets forth the final amount of reimbursement to which the intermediary believes the provider is entitled. If the provider is dissatisfied with the fiscal intermediary's determination, it may appeal and request an hearing before the Provider Review Board (the "Board"). Within 60 days after a final decision of the Board, the Secretary, on his own motion or at the request of the provider, may review the Board's decision. The Secretary is empowered to affirm, reverse, or modify the Board's decision. The Secretary has delegated his authority in this regard to Deputy Administrator. A provider dissatisfied with a final decision of the Board or the Deputy Administrator may seek review in the appropriate United States District Court. 42 U.S.C. § 1395oo(f). The District Court's review is made in accordance with the Administrative Procedure Act, and is on the basis of the administrative record. 5 U.S.C. § 706.

St. Luke's is a 434 bed non-profit acute care community hospital located in New Bedford, Massachusetts. St. Luke's, which is an approved provider under the Medicare program, submitted cost reports for 1978 and 1979 to its fiscal intermediary, Aetna Life and Casualty Company ("Aetna"). After receiving its Notice of Program Reimbursement from Aetna, St. Luke's appealed certain of Aetna's rulings to the Board. Specifically, St. Luke's appealed (1) denial of reimbursement for its accrued sick leave

---

1. Unless otherwise noted, all references to years are to fiscal years.

benefits costs, and (2) separate application of the lower of cost or charges principle to its Home Health Aide/Visiting Nurse Service. The Board agreed with St. Luke's that the hospital was entitled to reimbursement for its 1978 sick leave benefits costs, but held that it did not have jurisdiction to review the 1979 costs. The Board also adopted St. Luke's position on the lower of cost or charges principle. The Deputy Administrator reversed the Board, except to the extent that the Board held it was without jurisdiction to hear the 1979 sick leave costs appeal. St. Luke's then sought review in this Court.

The careful and competent efforts of counsel on both sides of this case make clear that three issues are now properly before this Court: (1) Is St. Luke's entitled to reimbursement for the accrued costs of vested sick leave benefits? (2) Did the Board have jurisdiction to consider St. Luke's claims as to 1979 sick leave benefits costs? (3) Did the Secretary properly apply the lower of cost or charges principle to the Home Health Aide/Visiting Nurse Service. The Court will address these issues in order.

## II. Sick Leave Benefits Costs

### A. *1978 Costs*

Among the benefits offered by St. Luke's to its employees is a structured sick pay/sick leave plan. Under the plan, full time employees earn one day of sick leave per month, and are allowed to accumulate sick days from year to year up to a maximum of 60 days. Any sick days accumulated in excess of the 60 day maximum are converted into a pay equivalent which the employee receives as bonus compensation in that year.

Employees who do not use their accumulated days of sick leave prior to terminating their employment can acquire a *vested* right to a cash payment for their unused sick days upon termination. During the fiscal years in question here St. Luke's changed the method by which payment rights were calculated. The specifics of the two plans are complex and not essential to this discussion. It is enough to note that, in general, the percentage of unused sick days that could be converted to cash depended on the length of employment of the particular employee. Under both plans, St. Luke's did not accrue a cost until an employee's right to the sick leave benefits vested.

Pursuant to the Secretary's regulations, St. Luke's accounts for its costs on an accrual basis. 42 C.F.R. § 405.453(a). Unlike cash basis accounting, which treats a cost as incurred only when it actually is paid, accrual basis accounting costs are reported "in the period in which they are incurred, regardless of when they are paid." *Id.* at § 405.453(b)(2). As regards sick leave benefits, St. Luke's reported these costs at the time the benefit became vested; that is, the time at which the employee had an absolute right to claim that sick day upon severance. In 1978, St. Luke's accrued $173,902 in vested sick leave benefits costs. Aetna and the Deputy administrator disallowed this cost.

The governing principle of the Medicare program, as reflected in the statute and the regulations, is that payments will be made on the basis of the "reasonable costs of services." 42 U.S.C. § 1395f(b); 42 C.F.R. § 405.451. Reasonable costs are "determined in accordance with regulations establishing the method or methods to be used, and the items to be included." 42 C.F.R. § 405.451(b)(1). The Secretary's regulations provide that the cost data submitted by a provider seeking reimbursement must be reported on the accrual basis. *Id.* at § 405.453(b)(2).

Notwithstanding these regulations, the Secretary challenges St. Luke's accrual of sick leave benefits costs on two grounds. First, the Secretary argues that the Provider Reimbursement Manual dictates the proper treatment of sick leave benefits costs. Second, the Secretary argues that sick leave benefits are actually deferred compensation. In either case, he would allow the cost to be reported only when sick leave benefits actually are paid. The Court thinks neither argument persuasive.

■ Section 2144.8 of the Medicare Provider Reimbursement Manual (HIM–15)

(the "Manual"), as was applicable in 1978, prohibited reimbursement of earned but unused sick leave costs. Instead, the Manual specified that the cost should be reported only when the provider actually made payment for the sick leave. The Secretary correctly points out that the Manual, as the agency's interpretation of its own regulations, is to be given controlling weight unless it is plainly erroneous or inconsistent with the regulations. *United States v. Larionoff*, 431 U.S. 864, 872, 97 S.Ct. 2150, 2155–56, 53 L.Ed.2d 48 (1977); *Braun Corp. v. Doyle*, No. 85–4018–Y, slip op. at 5 (D.Mass. December 20, 1985). Here, however, the Manual offends the latter part of that standard because it contradicts the requirement of the regulations that cost data be reported on the accrual basis.

■ The Manual's requirement that sick leave benefits costs be reported only when paid cuts against the most basic premise of accrual basis accounting; namely, that the actual time of payment is insignificant. *See e.g.*, Statement of Financial Accounting Standards No. 43 (FASB, 1980). St. Luke's reported the costs of sick leave benefits at the time the obligation to pay became certain, i.e. when it vested. This properly was the time at which the cost was "incurred." The Secretary's suggestion that vested sick leave benefits are contingent liabilities misses the mark. While it is true that the obligation is contingent as to *when* it will be paid, that is true of all accrued costs.

Perhaps recognizing that the sick leave benefits costs properly were accrued, the Secretary goes on to argue that § 405.453 (the accrual regulation) is only a record keeping requirement, which does not address when costs will be reimbursed. The argument is illogical. The Secretary mandates certain record keeping requirements precisely because the provider is entitled to reimbursement of reasonable costs. 42 C.F.R. § 405.453(a). To suggest that the Secretary required providers to seek reimbursement under one accounting system while he intended to make payment under another is contrary to the structure of the regulations. That this argument is without force is best evidenced by the fact that it

appears that every other court which has considered the matter has adopted the position advanced by St. Luke's here. *See Medical Society of South Carolina d/b/a Roper Hospital v. Heckler*, Medicare & Medicaid Guide (CCH) ¶ 33,651 (D.S.C. 1984); *McKeesport Hospital and Greene County Memorial Hospital v. Heckler*, 612 F.Supp. 279 (W.D.Pa.1985); *North Shore Medical Center v. Heckler*, Medicare & Medicaid Guide (CCH) ¶ 34,991 (S.D. Fla.1985).

■ The Secretary also argues that the sick leave benefits constitute an unfunded deferred compensation plan, the cost of which should be reported when payments actually are made. This argument stretches the definition of deferred compensation plan far beyond the limits of what is commonly accepted. That an employee may use an accumulated sick leave day as an actual paid sick day *before* he or she terminates employment is proof enough of that. In any event, the Secretary's attempt to recharacterize the plan does not escape the basic proposition that under the regulations the sick leave benefits costs were "incurred" in the year in which they became vested. 42 U.S.C. § 1395x(v)(1)(A).

B.  *1979 Costs*

■ In 1979 St. Luke's reported $244,841 in vested sick leave benefits costs. Owing apparently to Aetna's denial of its 1978 sick leave benefits costs, St. Luke's did not seek reimbursement for these costs in its 1979 cost report. Instead, it entered the cost on Worksheet A–8 of the cost report as a "self-disallowed cost." If a provider self-disallows a cost, there generally is no need for the fiscal intermediary to consider the cost.

When St. Luke's appealed its reimbursement to the Board for 1978 and 1979, it appealed the sick leave benefits issue for both years. Despite the fact that the issues presented were identical, the Board declined to exercise jurisdiction over the sick leave issue for 1979. The Board evidently took the position, as it had in the past, that it did not have jurisdiction to consider a self-disallowed cost, there being no "dispute" between the fiscal intermedi-

ary and the provider. The Deputy Administrator affirmed this part of the Board's decision. St. Luke's now appeals.

The statutory section governing the jurisdiction of the Board is hardly a model of clarity. It provides that:

> The board shall have the power to affirm, modify, or reverse a final determination of the fiscal intermediary with respect to a cost report and to make any other revisions on matters covered by such cost report (including revisions adverse to the provider of services) even though such matters were not considered by the intermediary in making such final determination.

42 U.S.C. § 1395oo(d); *see also* 42 C.F.R. § 405.1869. The question whether this section gives the Board jurisdiction to hear appeals on reported but unclaimed costs has caused disagreement among the Circuit Courts of Appeals, and is a matter of first impression in this district. *See Athens Community Hospital v. Schweiker*, 743 F.2d 1, 5–6 (D.C.Cir.1984) (hereinafter *Athens II*) (no jurisdiction unless cost "claimed" or "raised"); *St. Mary of Nazareth Hospital Center v. Dept. of Health and Human Services*, 698 F.2d 1337, 1346 (7th Cir.), *cert. denied*, 464 U.S. 830, 104 S.Ct. 107, 78 L.Ed.2d 110 (1983) (hereinafter *St. Mary*) (Board has authority to review self-disallowed costs); *Community Hospital of Roanoke Valley v. Health and Human Services*, 770 F.2d 1257, 1262 (4th Cir.1985) (provider must affirmatively place issue in controversy).

Much of the disagreement over the scope of jurisdiction conferred by the statute arises out of the fact that § 1395oo(d) actually contains two separate grants of jurisdiction which are not easily harmonized. First, the Board has the power to "affirm,

modify, or reverse a final determination of the fiscal intermediary with respect to a cost report." Second, the Board has the power "to make any other revisions on matters covered by such cost report ... even though such matters were not considered by the intermediary in making such final determination." Depending on how broadly they are construed, these two clauses can be either mutually exclusive or redundant.

In *St. Mary* the provider self-disallowed certain telephone costs. On appeal, the district court held that the costs were reimbursable, and reversed a decision of the Board to the contrary. At the court of appeals, the Secretary argued that the Board, and thus the court, was without jurisdiction to act upon the claim for reimbursement. The Seventh Circuit rejected this argument, holding that the Board had power to consider the self-disallowed cost. *St. Mary* at 1346. The court relied on the "even though such matters were not considered by the intermediary" language of the statute to rule that the broad grant of jurisdiction to the Board extended to self-disallowed costs.

The District of Columbia Circuit Court of Appeals rejected the *St. Mary* reasoning in *Athens II.*[2] There, the provider did not request reimbursement for certain stock option and tax costs in its 1973 and 1974 cost reports. Four years later, while the appeal to the Board was still pending, it sought to amend its 1973 and 1974 reports to include these costs. Treating the request as one to reopen, the Board denied the motion. Instead of appealing the refusal to reopen, the provider then sought to put the costs at issue in the pending appeal. The Board held that it lacked jurisdiction to review the claims. In affirming

---

**2.** It appears that in reaching its conclusion the *Athens II* court mischaracterized the holding of *St. Mary*. The court quoted *St. Mary* as holding that the Board "had the authority to consider whether [the undisclosed costs at issue] are reimbursable." *Athens II* at 5. The bracketed language is not an accurate description of the telephone costs, however. Indeed, *Athens II*, which did not involve self-disallowed costs, recognized that there are "a few different kinds of disclosure.... A second type of Disclosure is

where a provider lists a particular cost item on the cost report but does not request reimbursement.... The 'self-disallowance' cases fall into this category." *Id.* at 5. Thus, even under the *Athens II* court's definitional standards, the phone costs in *St. Mary* were not "undisclosed." This makes the *Athens II* holding—that a cost must be "raised"—much more curious. It is thus difficult to apply its reasoning to a self-disallowance case such as the one here.

the Board's decision the District of Columbia Circuit, through Judge Bork, held that the Board has jurisdiction only over those costs that were specifically claimed for reimbursement, or "raised" by the provider prior to the issuance of the Notice of Program Reimbursement. *Id.* at 5–6. The court rejected the argument that a cost disclosed on a cost report, but not claimed, was a "matter covered by the cost report." In its view, the Board's jurisdiction could be determined only in light of the provider's right to appeal. The statute specifies that a provider "may obtain a hearing with respect to a (A) cost report ... if [the provider] is dissatisfied with a final determination of the ... fiscal intermediary." 42 U.S.C. § 1395*oo* (a)(1)(A)(i). Thus, the court reasoned, it was "anomalous ... to think Congress intended to permit a provider to claim dissatisfaction based upon its own failure to request reimbursement of a cost item. If a provider is unhappy with the reimbursement the intermediary allowed in such a case, it is the fault of the provider and not the intermediary." *Athens II* at 6.

This Court declines to apply the *Athens II* holding to the case at bar for two reasons.[3] First, and most important, denying Board jurisdiction to review self-disallowed costs would contradict the statutory scheme. Second, such a result would be highly impractical and unduly burdensome on providers in light of the regulatory realities of the Medicare program.

To hold that the Board has jurisdiction only as to costs specifically claimed or raised before the fiscal intermediary, is to render meaningless the statutory grant of authority to consider matters "not considered by the intermediary in making such final determination." 42 U.S.C. § 1395*oo*(d). It seems clear that the statute creates a category of "matters covered by the cost report," but not "considered by the fiscal intermediary," over which the

Board has jurisdiction. Application of the plain language of the statute to the facts of this case compels the conclusion that the self-disallowed sick leave costs were "matters covered by the cost report." Therefore, the Board had jurisdiction to hear the 1979 appeal.

In addition, a finding that self-disallowed costs are unappealable would be highly inconsistent with the realities of the regulatory scheme established by Congress. As this case well demonstrates, it can take many years for a dispute between a provider and its fiscal intermediary or the Secretary to reach final judicial resolution. After a provider's claim for reimbursement of a cost is denied, the provider must decide how to treat that type of cost in the interim between initial denial and judicial review. For a variety of reasons, the most prudent course for the provider often will be to self-disallow the cost during that interim period. Here, for example, St. Luke's persuasively argues that in light of Aetna's treatment of the 1978 sick leave benefits costs, it feared that claiming reimbursement for the 1979 costs would violate the Medicare fraud statute. 42 U.S.C. § 1395nn. It does no violence to the statutory scheme to allow a provider to self-disallow a cost while continuing to appeal to the Board to reverse its position. The analogy is to a baseball team playing a game under protest; the provider abides by the ruling but does not concede the point.

The suggestion of the *Athens II* court that the provider's dissatisfaction is "the fault of the provider and not the intermediary" oversimplifies the effect of administrative lag on the provider's decision making. Here, both Aetna and the Secretary were well aware of the continuing dispute over the 1978 costs at the time St. Luke's submitted the 1979 report.[4] Thus, the self-disallowance of the sick leave benefits costs did not circumvent the fiscal intermediary's role in the review process. This is

---

**3.** The Court notes that *Athens II* was not a self-disallowance case. In declining to adopt that court's reasoning here the Court in no way intends to impugn the correctness of the *Athens II* holding as applied to the facts of that case.

**4.** There can be no dispute about this since Aetna mistakenly *"disallowed"* the unclaimed 1979 sick leave benefits costs. This disallowance demonstrates that, even under the *Athens II* standard, the Board had jurisdiction because in Aetna's view the costs had been "raised."

not the type of case, envisioned by the court in *Athens II*, where the provider listed "every conceivable cost on its cost report without claiming reimbursement ... [in hopes that] the intermediary will reimburse it ..., secure that it nevertheless will have [180 days] to concoct some reason to urge on the [Board] for reimbursement of the unclaimed costs." *Athens II* at 6. This case presents none of these concerns.

■ Accordingly, the Court holds that where a provider is denied reimbursement for a claimed cost, and in a subsequent year self-disallows that same type of cost while its appeal of the initial denial is still pending, the Board has jurisdiction to hear an appeal concerning the self-disallowed cost.

### III. The Home Health Services

In addition to its acute care hospital, St. Luke's operates a home health services department. The department provides two services, a Homemaker/Home Health Care Aide service and a Visiting Nurse Service. The Home Health Aide/Visiting Nurse Service (hereinafter referred to collectively as the "home health service") is located in a separate building from the rest of the hospital. St. Luke's has applied for and received a separate Medicare provider number for the home health service.

Prior to 1972 Medicare providers were reimbursed for the reasonable costs incurred in caring for Medicare beneficiaries. As the reasonable costs incurred in caring for Medicare patients began to exceed the amount normally charged to non-program beneficiaries, Congress feared that Medicare was bearing part of the costs of treating non-program patients. H.R.Rep. No. 92–231, 92nd Cong., 2nd Sess., *reprinted in* [1972] U.S.Code Cong. & Ad.News 4989, 5087–88. *See* 42 U.S.C. § 1395x(v)(1)(A). Thus, in 1972 Congress amended the Medicare statute to require that the program reimburse providers the lesser of "the reasonable cost of services ... or the custom-

ary charges with respect to such services." 42 U.S.C. § 1395f(b)(1); 42 C.F.R. § 405.-455. In other words, if a provider incurs costs with respect to a service which are greater than the amount the provider would normally charge non-Medicare patients for the service, Medicare will only reimburse the provider the amount of the customary charge. The remainder of the costs are disallowed, no matter how reasonable. Likewise, if a provider's costs with respect to a service are less than the amount normally charged for the service, Medicare will reimburse the provider only for its reasonable costs.

Because the statute speaks in terms of the lesser of cost or charges for a "service," certain accounting functions must be performed before the Secretary can determine a provider's eligibility to reimbursement. Under accepted accounting standards, a hospital's books do not reflect the cost of providing any "service," but rather account for the costs of the various items that go into providing the service. Accordingly, the Secretary's regulations specify cost finding methods which providers must use to determine the actual costs of services furnished. 42 C.F.R. § 405.453(d).

Under the regulations applicable in 1978 and 1979, both St. Luke's and its home health service were required, unless they received permission to use a more sophisticated method, to distribute indirect costs by using the step down method of cost finding.[5] In fact, Aetna did allow St. Luke's to use discrete costing to allocate certain indirect costs to the home health service. Because the home health service is separately housed, St. Luke's could identify separately the costs of depreciation, housekeeping and maintenance, and operation of plant attributable to the home health service, and directly assign these costs to the home health service on its cost report. Administrative and general costs[6] could not be directly assigned, however. Accordingly, these costs were allocated to

---

5. Notwithstanding the separate provider numbers, both entities are subject to the same cost finding process, and a portion of St. Luke's indirect costs are allocated to the home health service.

6. Administrative and general costs include 24 categories of cost items that range from personnel and accounting to printing and insurance.

the home health service according to the step down formula, which distributes costs across all departments of the hospital. Specifically, $88,432 was so allocated in 1978 and $128,084 in 1979.

■ St. Luke's complains that the Deputy Administrator erred when, in conjunction with the step down allocation of administrative and general costs, he separately applied the lower of cost or charges principle to St. Luke's and its home health service. St. Luke's contests the disallowance of $43,600 in 1978 and $30,800 in 1979, which amounts Aetna and the Deputy Administrator held to be costs in excess of the customary charges for home health services, and therefore not reimburseable under the lower of cost or charges principle. St. Luke's argues that the step down method used by Aetna overallocates administrative and general costs to the home health service, and that the separate application of the lower of cost or charges principle to St. Luke's and its home health service therefore is both improper and arbitrary. The Secretary responds that the separate application of the lower of cost or charges principle is required by the statute, and that St. Luke's should have sought permission to use a different cost finding method if it felt that step down was inaccurate. For the reasons discussed below the Court agrees with the Secretary.

St. Luke's first argues that, as used in the statute and the regulations, the term "provider" does not require the separate application of the lower of cost or charges principle to a hospital based home health service. St. Luke's suggests that Congress did not intend for the principle to be applied to separate providers within a single "institution." Accordingly, says St. Luke's, the lower of cost or charges principle should be applied only to the combined costs and charges of its hospital and home

health service. The argument is of little force.

*Lafayette Home Hospital v. Califano,* Medicare & Medicaid Guide (CCH) ¶ 30,556 (N.D.Ind.1979), is the only other case of which the Court is aware that involved a challenge to separate application of the lower of cost or charges principle to a hospital and its related facility. In rejecting an argument virtually identical to the one made here by St. Luke's, the *Lafayette* court said, "fairly read, these regulations do not even hint that a corporation operating two providers will be reimbursed as a single unit." *Id.* at 10, 228–29. That analysis is sound. The path by which St. Luke's reaches its interpretation of the statute is too twisted and laborious for this Court to follow. Instead, the Court prefers the more direct route of attributing to the statute the plain meaning of its language. Section 1395f(b) of the statute speaks in terms of "provider," not institution. Thus, the Secretary did not err in separately applying the lower of cost or charges rule.[7]

■ St. Luke's next argues that if the lower of cost or charges principle is applied separately to the home health agency, then the use of the step down method of cost finding is an "invalid" way to allocate administrative and general costs in this case. St. Luke's position is that the step down method overallocates administrative and general costs to the home health service in a way that bears no reasonable relationship to its actual costs. This overallocation, in conjunction with the lower of cost or charges principle, subjects St. Luke's to "arbitrary and inadequate" levels of reimbursement. Accordingly, St. Luke's requests that, upon remand, it be permitted to utilize a more accurate cost finding methodology which would not "penalize" it for failing to pass on "artificially inflated costs."[8]

---

7. To the extent that St. Luke's attack is on the requirement that the home health service obtain its own provider number, it is without merit. The statute makes clear that a hospital and a home health agency are separate providers of services. 42 U.S.C. § 1395x(u).

8. St. Luke's consistently refers to a "penalty" due to "overallocation" of costs to the home

health service. This is a mischaracterization of the effect of the Deputy Administrator's actions, however. In its brief St. Luke's asserts that its home health service charges reflected the actual costs of providing those services. Therefore, any refusal to reimburse St. Luke's above these charges, by definition, cannot be a penalty, because it was being reimbursed for its actual

There is at least superficial merit in St. Luke's argument. There is in the record uncontroverted evidence which tends to demonstrate that the step down method can overallocate administrative and general costs to a provider based home health agency. *See e.g.,* 45 Fed.Reg. at 38015 (1980). That does not end the inquiry, however. The Secretary's regulations specifically provide that if a provider believes the step down method disproportionately allocates costs, it may seek the approval of its fiscal intermediary to use a more sophisticated method of cost finding. 42 C.F.R. § 405.453(d)(2)(ii). In this case St. Luke's did not request a change in either the allocation basis or the cost finding method used with respect to administrative and general costs. The only explanation St. Luke's gives for this failure is that the alternative record keeping would be "unduly burdensome."

The suggestion by St. Luke's that the alternative methods of cost finding would be unduly burdensome begs the question. If the burden was greater than the amount disallowed, why does St. Luke's appeal? If the burden was less, why did it not timely request to use a more sophisticated method? There is nothing in the record which suggests that St. Luke's was unaware of its option to use a more sophisticated method of cost finding. Consequently, the Court must assume that the choice to use step down cost finding was a rational business decision based on St. Luke's estimate of its best interests at the time.

Viewed from this perspective, St. Luke's argument that it was penalized when it was "forced" to use the step down method is somewhat misleading. More accurately presented, St. Luke's position is this: The step down method is "unfair" and the alternative is "burdensome," so the Court should remand the case and instruct the Secretary to figure out a better cost find-

ing method, which, by the way, we haven't yet figured out ourselves. The Court cannot say that it was error for the Deputy Administrator to refuse to adopt this position.

It is not enough to point out that the step down method is less than perfect. The Administrative Procedure Act does not demand perfection; rather, it counsels that agencies must be as fair and competent as is possible in light of the tools that are available to do the job. Here the Secretary has set forth a reasonable, if not perfect, method of cost finding. St. Luke's challenges the Secretary's method, but has at no point suggested a specific alternative method that would be more appropriate. To borrow from Winston Churchill, it appears that the Secretary has established the worst system in the world, except for all the others. Accordingly, this Court rules that the Deputy Administrator acted appropriately in requiring St. Luke's to use the step down method in the absence of any request to use a more sophisticated method.

■ The *Lafayette* court, although approving of the Secretary's use of step down cost finding in principle, nonetheless remanded the case in order for the Secretary to determine more precise allocation bases with respect to certain costs. *Lafayette* at 10, 231. Upon consideration, this Court rules that such a result is not necessary on the facts of this case. Here, the Secretary required St. Luke's to allocate administrative and general costs on the basis of accumulated costs. If the Court were to remand the case for determination of a new allocation basis, it appears that "frequency of use" would be the most likely alternative.[9] Yet, allocating stepped down costs on the basis of frequency of use is virtually indistinguishable from the discrete costing that St. Luke's claims is unduly burden-

costs. The more accurate description of the problem is the "underallocation" of costs to the hospital, which presumably could absorb these costs without triggering the lower of cost or charges rule. In any event, this characterization issue, while helpful in analyzing the

problem, does not change the result the Court reaches.

9. Because St. Luke's never suggests what, if any, allocation basis would be preferable to accumulated costs, the Court must speculate somewhat as to this point.

some. In both cases St. Luke's would be required to maintain records of the use of the various services that make up administrative and general costs. In any event, it does not appear from the record that such data is available for the years in question here. Since the accumulated cost basis is not facially unreasonable, and there is no suggestion of a more accurate basis that would not be unduly burdensome, the Court rules that it was not an abuse of discretion to require the administrative and general costs here be allocated on the basis of accumulated costs.

Finally, St. Luke's points to the congressional policy of encouraging and facilitating increased availability of home health services as support for the positions it advocates here. The Court agrees with St. Luke's that the committee reports it cites demonstrate a belief in the importance of "stimulat[ing] the growth and development of home health services." S.Rep. No. 94–28, 94th Cong., 1st Sess. 126, *reprinted in* [1975] U.S.Code Cong. & Ad.News 469, 589. But what Congress might have wanted and what it did are two separate questions, with only the latter constituting an appropriate area of inquiry for the courts. If Congress thinks that this Court's interpretation of the Medicare statute frustrates other important goals, then it is of course free to amend the statute. It is not for this Court to re-write a statute, but rather to interpret it as written. The interpretation supplied here is in keeping with the plain meaning of the language upon which Congress voted.

In accordance with all that has just been said, the decision of the Deputy Administrator is reversed to the extent it denies St. Luke's reimbursement for its accrued sick leave benefits costs in fiscal years 1978 and 1979, and affirmed in all other respects. The case is REMANDED to the Secretary for calculation and payment of reimbursement in accordance with this opinion.