NATIONAL MEDICAL ENTERPRISES, INC., a Nevada corporation, doing business through wholly-owned subsidiaries, as Alvarado Community Hospital, Chico Community Hospital, Doctors Hospital of Lakewood, Doctors Hospital of Modesto, Doctors Hospital of Montclair, Dominguez Valley Hospital, Lodi Community Hospital, Los Altos Hospital, Manteca Hospital, Memorial Hospital of Redding, Ojai Valley Community Hospital, Ontario Community Hospital, Garfield Medical Center, Doctors Hospital of Pinole, Twin Cities Community Hospital, Sierra Medical Center, and Northgate General Hospital, Plaintiffs,

v.

Otis BOWEN, M.D., Secretary of the Department of Health and Human Services, Defendant.

No. CV 86–2817–ER(Tx).

United States District Court, C.D. California.

May 7, 1987.

Patric Hooper, Weissburg & Aronson, Inc., Los Angeles, Cal., for plaintiffs.

Carolyn Reynolds, Asst. U.S. Atty., Robert C. Bonner, U.S. Atty., Los Angeles, Cal., for defendant.

## ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

RAFEEDIE, District Judge.

Cross-motions for summary judgment came on for hearing on November 17, 1986, Patrick Hooper of Weissburg and Aronson appearing for plaintiff National Medical Enterprises, Inc. ("NME") and Carolyn Reynolds, Assistant United States Attorney, appearing for defendant Otis T. Bowen, M.D., the Secretary of the Department of Health and Human Services ("the Secretary").

NME is the parent corporation and the Medicare "home office" for the various subsidiary corporations doing business as the eighteen hospitals in this action. NME brought this action to obtain judicial review of a final decision of the Deputy Administrator of the Health Care Financing Administration ("Deputy Administrator") acting pursuant to a delegation of authority from the Secretary. The Deputy Administrator denied NME's request for reimbursement of certain costs relating to the return on equity capital ("ROE") incurred in fiscal years 1974–1979. Upon the parties bringing cross-motions for summary judgment, the Court granted NME's motion for summary judgment and denied the Secretary's motion because the Secretary's decision was neither in accordance with the law nor supported by substantial evidence in the administrative record ("Record") taken as a whole.

## I. BACKGROUND

The federal Medicare program which provides a system of health insurance for the aged and disabled was established by the Medicare Act, 42 U.S.C. § 1395 *et seq.* As certified providers of services under the federal Medicare program, each of NME's hospitals was entitled to receive reimburse-

ment from the Department of Health and Human Services ("DHHS") for the reasonable costs of services it provided under the Medicare program. 42 U.S.C. §§ 1395x(e) and (u), 1395f(b).

DHHS reimburses providers of services such as NME's hospitals for their reasonable costs through "fiscal intermediaries." Fiscal intermediaries are private financial entities which serve as agents for the Secretary. In order to receive payment for its reasonable costs, a provider files a cost report with its fiscal intermediary. The fiscal intermediary then reviews and audits the cost report. In determining which costs are reimbursable, fiscal intermediaries are required to review cost reports according to the specific instructions of the Provider Reimbursement Manual HIM 15–II ("HIM 15–II").[1] Upon completing its review of a cost report, a fiscal intermediary issues the provider of services a Notice of Program Reimbursement which states the fiscal intermediary's determination of the amount of reimbursement to which the provider is entitled. The provider may then appeal by requesting a hearing before the Provider Review Board (the "Board"). Following the final decision of the Board, the Secretary has 60 days to affirm, reverse, or modify the Board's decision. The Deputy Administrator conducts this review pursuant to the Secretary's delegation.

## A. JUDICIAL REVIEW

The Deputy Administrator's decision is considered the final agency decision, and a dissatisfied provider may seek review in the United States District Court. 42 U.S.C. § 1395oo(f). Judicial review is made in accordance with the Administrative Procedure Act, 5 U.S.C. §§ 701–706, and is based on the administrative record. 5 U.S.C. § 706. Review is limited to determining whether the agency action is arbitrary, capricious, an abuse of discretion, not in accordance with the law, or unsupported by substantial evidence in the record taken as a whole. *Id.; Villa View Community*

*Hosp., Inc. v. Heckler,* 720 F.2d 1086, 1090–91 (9th Cir.1983).

Determining which prong of this standard applies depends on whether the question reviewed is one of law, fact, or policy. *White Memorial Medical Center v. Schweker,* 640 F.2d 1126, 1129 (9th Cir. 1981). Here, the reasons underlying the Secretary's decision relate to law and fact. Thus, "not in accordance with the law" and "unsupported by substantial evidence," respectively, are the prongs of the *Villa View* standard applicable here.

## B. INTERIM PAYMENTS

More than a year may pass between a provider's submission of its cost report at the close of the accounting period (one year) and the intermediary's issuance of the Notice of Program Reimbursement. In order to meet the cash flow needs of a provider, the Medicare regulations require the fiscal intermediary to make interim payments to the provider which approximate the provider's actual costs. The intermediary must make these payments at least monthly. 42 C.F.R. § 413.64(b). Since the fiscal intermediary cannot make the initial determination of a provider's actual costs until the end of the accounting period, the intermediary must pay the provider on an estimated cost basis during the year. 42 C.F.R. § 413.64(b). The clear intent of the regulations governing interim payments is that the interim payments shall approximate actual cost as nearly as is practicable so that the retroactive adjustment based on a provider's reasonable actual costs will be as small as possible. 42 C.F.R. § 413.64(b).

## C. THE RETURN ON EQUITY CAPITAL (ROE)

Reasonable costs, for purposes of reimbursement under the program, are defined in the Medicare regulations. 42 C.F.R. § 413.9. The applicable Medicare regulations require that DHHS pay to providers of hospital services a return on equity capi-

---

1. As will be seen below, the force of the provisions of HIM 15–II is a major issue. The Provider Reimbursement Manual I HIM 15–I

("HIM 15–I") is a related document which consists of guidelines designed to help interpret and implement the controlling Medicare regulations.

tal as an element of the reasonable costs of such services. 42 C.F.R. § 413.157(a). Equity capital is a provider's investment in plant, property, and equipment related to patient care, and the net working capital maintained for necessary and proper operation of patient care activities. 42 C.F.R. § 413.157(b). ROE is the return the Medicare program pays a provider for the portion of his equity capital which is attributable to Medicare patients. "Proprietary institutions historically have financed capital expenditures through funds invested by owners in the expectation of earning a return. A return on investment ... is needed to avoid withdrawal of capital and to attract additional capital needed for expansion." 42 C.F.R. 413.157(b). Although in a sense ROE represents the profit the Medicare program pays private providers for treating Medicare patients, under standard accounting practices, ROE is treated as a cost for purposes of Medicare reimbursement.

A portion of the interim payments represents ROE. The central issue in this case is how the portion of the interim payments that represent ROE should be treated for accounting purposes.

Pursuant to the Secretary's regulations, private for-profit providers such as NME must keep records of their costs on the accrual basis of accounting. 42 C.F.R. § 413.24(a). Whereas cash basis accounting records costs on the books as incurred only when they are actually paid and records revenue only when it is received, accrual accounting records costs on the books in the period in which they were incurred, regardless of when they are paid, and records revenue when it is earned, regardless of when it is collected. 42 C.F.R. 413.24(b)(2).

The record shows that NME does not differentiate between the portion of the interim payments that represent reimbursement for the cost of ROE and that which represents the reimbursement of its other costs. The record shows that according to the accepted procedures of the accrual method of accounting, all of the interim payments are recorded in the books as earned revenue. Since the portion of the interim payments representing ROE are part of the earned revenue of NME hospitals, the return on equity capital contributes to working capital.[2] Because the Medicare regulations define net working capital as part of equity capital, 42 C.F.R. 413.157(b), it is clear that the portion of a given interim payment representing ROE contributes directly to the amount of a hospital's equity capital as soon as the payment is recorded on the books. Because accrual accounting principles require revenue to be recorded in the period when it is earned, regardless of when it is collected, ROE contributes to equity capital itself. NME essentially is claiming that the balance of equity capital at the end of a given cost reporting period should reflect the contributions of the ROE invested in the period, thus increasing the magnitude of the ROE.

The Secretary, on the other hand, argues that the ROE in a cost reporting period should only be considered to be earned at 12:01 a.m. on the first day of the next period. Under the Secretary's view, ROE for a given period could not contribute to equity capital for the same year. Being based on a smaller final equity capital balance, the ROE paid NME for the period would be smaller. For the years in question, the difference amounts to approximately $298,000.

## II. THE PROCEDURE AND POSITIONS BELOW

The fiscal intermediaries for the various NME hospitals disallowed the claims NME had based on entering ROE for a cost reporting period into the calculations of the final equity capital balance, and NME timely appealed these adjustments to the Board. After a full hearing, the Board reversed these adjustments of the in-

---

2. Under the accrual system of accounting, earned revenue is a part of a hospital's current assets. The excess of the hospital's current assets over its current liabilities is part of the hospital's net working capital. Therefore, ROE, being part of the hospital's earned revenue, contributes to the working capital of NME's hospitals.

termediaries, finding that current-year ROE should be included in the computation of equity capital for the current year. The Deputy Administrator of HCFA reversed the Board's decision.

Since this Court's task is limited to reviewing the decision of the Secretary, a detailed analysis of the positions taken by the fiscal intermediaries or the Board is unnecessary. However, outlining those positions does place the decision of the Secretary in perspective, so they are briefly set forth at this point.

## A. THE POSITION OF THE INTERMEDIARIES

In the proceeding before the Board, the intermediaries justified the disallowances for several reasons. The strongest justification for the disallowances were that the intermediaries were obligated to follow the Provider Reimbursement Manual guidelines. Record 191, 192. Section 1220.1 of HIM 15–I requires ROE to be calculated based upon an average of the balance of equity capital over the cost reporting period. The balance of equity capital is basically computed by adding the month-to-month net changes in the balance of equipment capital to the balance of equity capital at the beginning of the cost reporting period. Section 385.1 of HIM 15–II requires ROE earned during a given cost reporting period to be removed from the balance of equity capital at the end of the cost reporting period. The net effect of these two guidelines is to reduce NME's year-end balance of equity capital which in turn reduces NME's ROE.

Furthermore, under 42 C.F.R. § 413.157, only investment related to patient care can contribute to equity capital. The intermediaries also argued that ROE for a given cost reporting period was not used or invested in a provider's operations during the same cost reporting period and that it therefore could not be considered under 42 C.F.R. § 413.157 to contribute to equity capital in the same period. Record 191–92. As discussed *supra*, this argument was based on the erroneous conclusion that NME hospitals did not use ROE to provide services in the period in which ROE was earned. Finally, the intermediaries claimed that it would be impossible to calculate the contribution of a given year's ROE to the equity capital balance for that year based on auditable records.

## B. THE BOARD'S DECISION

The Board found that current-year ROE should be included in the computation of equity capital for the current year. The Board based its decision solely on the Medicare regulations, which have the force of law, and not upon the Provider Reimbursement Manual which contains only guidelines. The Board noted that 42 C.F.R. § 413.157(b)(4) provided that ROE is an element of allowable cost. Record 39. In a crucial factual finding, the Board concluded that the payments from Medicare in a given cost reporting period, including the portion of the interim payments representing ROE, may be invested in NME's operations during the same cost reporting period just like any other revenue. Record 40. Pursuant to 42 C.F.R. § 413.24(a), which requires NME to use accrual accounting procedures, the Board concluded that those procedures required providers to accrue ROE as part of current assets. *Id.* Since current assets contribute to net working capital, which in turn is part of allowable equity capital, the ROE itself contributes to equity capital. *Id.* The Board drew further support for its view that ROE was a current cost from 42 C.F.R. § 413.5(a) and (b)(2). *Id.* 42 C.F.R. § 413.5(a) specifies that payment to providers "is to be made on the basis of current costs of the individual provider." 42 C.F.R. 413.5(b)(2) specifies "[t]hat in addition to current payment, there should be retroactive adjustment so that increases in costs are taken fully into account as they actually occurred...."

## C. THE REASONS FOR THE SECRETARY'S DECISION

The Secretary gives five reasons for reaching his decision:

(1 & 2) Section 385.1 of HIM 15–I and section 1220 of HIM 15–II mandate his result. Record 5.

(3) Computing ROE as NME suggests is impossible. Record 5.

(4) Section 1861(v)(1)(B) of the Social Security Act[3] and 42 C.F.R. § 413.157 imply that equity capital must be determined before a return can be computed. Record 5.

(5) ROE for the current cost period cannot be used in the provision of patient care in the current cost period because it is not available for use until the following cost period since according to 42 C.F.R. § 413.157, equity capital must have been invested and used in the provision of patient care in the period for which a return is claimed. Record 5-6.

Reasons 1, 2, and 4 are conclusions of law. Reasons 3 and 5 are conclusions of fact.

## III. REVIEW OF THE SECRETARY'S DECISION

■ This Order will not explicitly discuss what the Secretary has labeled "Conclusions of Law" as it is the Secretary's reasoning which the Court must review. In a case dealing specifically with review of the Secretary's decisions in the area of Medicare reimbursement, the Ninth Circuit stated that "an agency's decision can be upheld only on a ground upon which it relied in reaching that decision." *Vista Hill Foundation, Inc. v. Heckler*, 767 F.2d 556, 559 (9th Cir.1985). This Court therefore may not affirm the Secretary's decision based on an explanation adduced by the government at this time if the record shows no indication that the Secretary had relied on the explanation when making his original decision. Similarly, this Court may not develop its own reasons for upholding the Secretary's decision.

## A. REASONS 1 & 2: RELIANCE ON THE PROVIDER REIMBURSEMENT MANUAL

■ The Secretary's first two reasons rely on two sections of the Provider Reimbursement Manual. As the Ninth Circuit

has pointed out, "[t]he Manual [HIM 15–I and II] is a guide for intermediaries in applying the Medicare statute and reimbursement regulations and does not have the binding effect of law or regulation." *Phoenix Baptist Hospital and Medical Center v. Heckler*, 767 F.2d 1304, 1307 (9th Cir.1985). For this reason § 385.1 of HIM 15–I and § 1220 of HIM 15–II can only be considered the Secretary's interpretation of the statute and regulations. In *Phoenix Baptist* the Ninth Circuit held that the Secretary's interpretations of DHHS regulations are entitled to some deference. However, the Secretary's interpretation is not entitled to such deference if the result is inconsistent with the statute and the regulations. *Vista Hill*, 767 F.2d at 559–60. This is a case where the Secretary's interpretation as expressed through these guidelines conflicts with the regulations.

The statute and regulations do not explicitly state the time at which the ROE is deemed to have been paid. However, 41 C.F.R. § 405.453(a) mandates that non-governmental providers must use the accrual basis of accounting. "Under the accrual basis of accounting, revenue is reported in the period when it is earned, regardless of when it is collected...." 42 C.F.R. § 413.-24(b)(2). Following accrual accounting procedures, NME must enter the revenue from the ROE in the current year. Record 81–82. Additionally, the rule in the Ninth Circuit is that:

> Where the Secretary has not prescribed different accounting practices by regulation, the Secretary must apply generally accepted accounting principles to determine whether a particular cost claimed by provider is reimbursable under the Medicare Act.

*Villa View*, 720 F.2d at 1093 n. 18.

This rule applies in this case. Although this controversy can be looked at as just a matter of *when* to record a certain type of revenue—either in the current cost reporting period or in the next period, the controversy is equally one of entitlement because the timing of when the revenue is deemed to be received affects the magnitude of the

---

**3.** 42 U.S.C. § 1395x.

reimbursement. The only non-arbitrary way of extracting a specific timing for the recording of the ROE from the regulations is to look to when the mandated accounting procedures require its recording.

Judge Young used this reasoning in the case most closely addressing this issue, *St. Luke Hospital v. Secretary of Health & Human Services*, 632 F.Supp. 1387 (D.Mass.1986). *St. Luke Hospital* considered the question of when a hospital was entitled to Medicare reimbursement for the cost of employees' sick leave. The hospital claimed the cost was reimbursable in the year in which an employee's sick leave vested in accordance with accrual accounting procedures. The Secretary did not want to pay the provider for this cost until the hospital actually paid an employee sick leave. The judge held for the hospital. The reasoning of *St. Luke* is highly relevant to this case:

> Perhaps recognizing that the sick leave benefits costs properly were accrued, the Secretary [argues] that § 405.453 (the accrual regulation) is only a record keeping requirement, which does not address when costs will be reimbursed. The argument is illogical. The Secretary mandates certain record keeping requirements precisely because the provider is entitled to reimbursement of reasonable costs. 42 C.F.R. § 405.453(a). To suggest that the Secretary required providers to seek reimbursement under one accounting system while he intended to make payment under another is contrary to the structure of the regulations.

*Id.* at 1391.

Several further regulations support the proposition that ROE should be recorded in the period in which NME received payment. 42 C.F.R. § 413.5, which provides the general principles of cost reimbursement, states that "payment is to be made on the basis of *current* costs of the individual provider ..." and that "the methods of reimbursement should result in *current payment* so that institutions will not be disadvantaged ... by having to put up money for the purchase of goods and ser-

vices well before they receive reimbursement." 42 C.F.R. §§ 413.5(a) and (b)(1), respectively (emphasis added).

## B. REASON 3: THE RETURN ON ROE IS IMPOSSIBLE TO CALCULATE

The Secretary's determination that ROE is impossible to compute using the NME computation is a factual determination not supported by substantial evidence. It is, in fact, contradicted by the record and common sense. The record shows that NME routinely makes a calculation of the amount in question as part of its accounting procedures. The intermediaries have been subtracting this amount from the year-end cost reports of NME's hospitals. Record at 102–103. The Secretary's determination that NME's suggested computation is impossible "because each time the return on equity capital is computed, it would then have to be added to net equity and recomputed ..." ignores the fact that standard accounting and mathematical techniques have allowed NME to make this calculation. Record 96–99.

## C. REASON 4: SECTION 1861(v)(1)(B) OF THE SOCIAL SECURITY ACT AND 42 C.F.R. § 413.157 IMPLY THAT EQUITY CAPITAL MUST BE DETERMINED BEFORE A RETURN CAN BE COMPUTED

The Secretary states that § 1861(v)(1)(B)[4] and 42 C.F.R. § 413.157 "call for payment of a return on equity capital," and that "[i]mplicit in this is that equity capital must be determined before a return can be computed." Record 5. Although the conclusion is perhaps intuitively attractive, nothing in § 1861(v)(1)(B) or § 413.157 implies this in any way. Neither § 1861(v)(1)(B) nor § 413.157 contain any language that can be read as speaking to this issue. Indeed, the Secretary's motion for summary judgment contained no serious argument on this point.

---

**4.** 42 U.S.C. § 1395x.

## D. REASON 5: THE RECORD SHOWS ROE IS INVESTED

The last reason for the Secretary's decision is his claim that ROE for the current cost period cannot be used in the provision of patient care in the current cost period because it is not available for use until the following cost period. Record 5–6. If this were true, a return on ROE would not be allowed because 42 C.F.R. § 413.157 requires that equity capital must have been invested and used in the provision of patient care in the period for which a return is claimed in order to entitle a provider to a return on that capital.

This is a factual determination which is not supported by substantial evidence in the record. In the record it is uncontradicted that a portion of NME's interim payments represent return on equity capital and that all of each interim payment is used as working capital during the period in which it is received without regard to what portion is due to ROE and what portion is due to all other costs. Record 40, 83, 105–106.

## IV. CONCLUSION

Since the Secretary's decision was neither in accordance with the law nor supported by substantial evidence in the record taken as a whole, it is set aside. Plaintiff's motion for summary judgment is granted, and defendant's motion for summary judgment is denied. Plaintiffs are entitled to reimbursement in accordance with the decision of the Board. This case is remanded to the Secretary for calculation and payment of reimbursement in accordance with this ruling. Plaintiffs are entitled to their costs of suit.

IT IS SO ORDERED.