CONNECTICUT DEPARTMENT OF INCOME MAINTE-
NANCE *v.* HECKLER, SECRETARY OF HEALTH
AND HUMAN SERVICES, ET AL.

No. 83–2136.   Argued March 27, 1985—Decided May 20, 1985

STEVENS, J., delivered the opinion for a unanimous Court.

*Charles A. Miller* argued the cause for petitioner. With him on the briefs were *Joseph I. Lieberman,* Attorney General of Connecticut, *Donald M. Longley,* Assistant Attorney General, and Michael A. Roth.

*Kathryn A. Oberly* argued the cause for respondents. With her on the brief were *Solicitor General Lee, Acting Assistant Attorney General Willard, Deputy Solicitor General Geller,* and *Howard S. Scher.*\*

JUSTICE STEVENS delivered the opinion of the Court.

Services performed for patients between the ages of 21 and 65 in an "institution for mental diseases" (IMD) are not covered by the Medicaid Act. The Secretary of Health and Human Services has adopted a definition of that term that is broad enough to encompass an "intermediate care facility" (ICF). The Middletown Haven Rest Home is an ICF that provides care for persons with mental illness as well as other diseases. The narrow question presented by this case is whether Middletown Haven is an IMD within the meaning of the Act. The broader question is whether the Secretary's definition of an IMD, which permits an ICF to be classified as an IMD, is consistent with the intent of Congress.

During the period between January 1977 and September 1979, the State of Connecticut paid Middletown Haven for the services it provided to Medicaid eligible patients, includ-

---

\*Briefs of *amici curiae* urging reversal were filed for the State of Illinois et al. by *Neil F. Hartigan,* Attorney General of Illinois, *Jill Wine-Banks,* Solicitor General, *James C. O'Connell* and *Barbara L. Greenspan,* Special Assistant Attorneys General, *John K. Van de Kamp,* Attorney General of California, *Thomas E. Warriner,* Assistant Attorney General, *Elisabeth C. Brandt,* Deputy Attorney General, *Hubert H. Humphrey III,* Attorney General of Minnesota, and *Beverly Jones Heydinger,* Assistant Attorney General; for the Commonwealth of Massachusetts by *Francis X. Bellotti,* Attorney General, and *Thomas A. Barnico* and *William L. Pardee,* Assistant Attorneys General; and for the American Psychiatric Association et al. by *Joel I. Klein, Paul M. Smith,* and *R. Emmett Poundstone III.*

ing those between the ages of 21 and 65 who had been transferred to Middletown Haven from state mental hospitals. Under the Medicaid program, the State received federal reimbursement of $1,634,655 for those payments.

After receiving information that Connecticut was discharging large numbers of mental patients from state mental institutions into ICFs and skilled nursing facilities, and after numerous meetings with state officials, the Department of Health and Human Services selected Middletown Haven, which is certified by the State as an ICF, for review and audit. The Department believed that the State was receiving federal financial aid in violation of applicable regulations that prohibited aid to IMDs.

Middletown Haven is a privately owned, 180-bed facility that is licensed by the Connecticut State Department of Health as a "Rest Home with Nursing Supervision" with authority "to care for persons with certain psychiatric conditions."[1] During the years 1977–1979 over 77% of its patients suffered from a major mental illness, and over half of its patients were transferees from state mental hospitals.[2] Middletown Haven employed a professional staff, including three psychiatrists, that specialized in the care of the mentally ill;[3] they viewed it as a psychiatric facility.[4] In sum, there was ample evidence for the review team's conclusion that Middletown was "primarily engaged" in providing diag-

---

[1] App. 35a–37a.

[2] Id., at 17a.

[3] Id., at 22a–23a.

[4] Id., at 14a. Although Middletown Haven did not hold itself out to the media as a mental institution, and although the level of care provided to patients at the facility was less restrictive than that provided in a typical mental hospital, Middletown Haven did hold itself out as a facility specializing in the treatment of mental diseases to sources of referral. Id., at 15a. Moreover, Middletown Haven cared for individuals that could have been admitted into mental institutions and had a patient population uncharacteristic of nursing homes. Id., at 20a.

nostic treatment and care for persons with mental diseases within the meaning of the applicable regulations.[5]

After the completion of its audit, the Department gave notice to the State that the federal reimbursement of $1,634,655 was not allowable because Middletown Haven had been identified as an IMD and because payments for services to the mentally ill between the ages of 21 and 65 in IMDs were not eligible for federal financial participation.[6]  The State's

---

[5] The Secretary's regulations, 42 CFR § 435.1009(e) (1984), define an IMD as follows:

"an institution that is primarily engaged in providing diagnosis, treatment or care of persons with mental diseases, including medical attention, nursing care and related services.  Whether an institution is an institution for mental diseases is determined by its overall character as that of a facility established and maintained primarily for the care and treatment of individuals with mental diseases, whether or not it is licensed as such."

The Secretary has developed criteria designed to focus on what constitutes "primarily engaged" and "overall character."  The review team utilized the following criteria when evaluating Middletown Haven:

1. That a facility is licensed as a mental institution;

2. That it advertises or holds itself out as a mental institution;

3. That more than 50% of the patients have a disability in mental functioning;

4. That it is used by mental hospitals for alternative care;

5. That patients who may have entered a mental hospital are accepted directly from the community;

6. That the facility is in proximity to a state mental institution (within a 25-mile radius);

7. That the age distribution is uncharacteristic of nursing home patients;

8. That the basis of Medicaid eligibility for patients under 65 is due to a mental disability, exclusive of services in an institution for mental disease;

9. That the facility hires staff specialized in the care of the mentally ill; and

10. That independent professional reviews conducted by state teams report a preponderance of mental patients in the facility.  App. 12a–13a, 22a–23a.

[6] Id., at 1e–6e.  The letter stated that, because federal financial participation "is not available in payments to IMDs for persons aged 21 to 64, and

request for administrative review of the disallowance decision was consolidated with similar requests by the States of Illinois, Minnesota, and California. The Department's Grant Appeals Board upheld the disallowance.[7]

The State then obtained judicial review by filing this action.[8] The United States District Court for the District of Connecticut held that the Secretary's decision was not supported by the statute and set aside the disallowance. *Connecticut* v. *Schweiker*, 557 F. Supp. 1077 (1983). The Court of Appeals for the Second Circuit reversed, 731 F. 2d 1052 (1984), expressly rejecting the contrary reasoning of the Eighth Circuit. See *Minnesota* v. *Heckler*, 718 F. 2d 852 (1983). The square conflict on an important question of statutory construction prompted us to grant certiorari. 469 U. S. 929 (1984).

Connecticut contends that the same institution cannot be both an "institution for mental diseases" and an "intermediate care facility"; in other words, IMDs and ICFs are mutually exclusive categories. Because the Secretary acknowledges that Middletown Haven is an ICF, the State concludes that it cannot be an IMD. In our view, however, the State's position is foreclosed by the plain language of the statute, by the Secretary's reasonable and longstanding interpretation of the Act, and by the Act's legislative history. We therefore affirm.

I

In 1965 Congress authorized the Medicaid program by adding Title XIX to the Social Security Act;[9] the program was established "for the purpose of providing federal financial

---

because the State plan does not cover services by such facilities to individuals under 21 or over 65, no payments to IMDs are eligible" for federal financial participation. *Id.*, at 2e.

[7] App. to Pet. for Cert. 40d–44d.

[8] In addition to filing in District Court, the State sought direct appellate review. The Court of Appeals dismissed for want of jurisdiction. 731 F. 2d 1052, 1055 (CA2 1984).

[9] 79 Stat. 343.

assistance to States that choose to reimburse certain costs of medical treatment for needy persons."[10]   The program offers the financial assistance to States that submit and have approved by the Secretary plans for "medical assistance."[11]   In its present form, the Act authorizes reimbursement for 18 categories of medical assistance.[12]

For three types of covered medical services—inpatient hospital services, skilled nursing facilities services, and, most importantly, intermediate care facility services—the definition contains an express exception for services performed in IMDs.[13]   The thrice-repeated exclusion demonstrates that Congress did not intend the ICF and IMD categories to be mutually exclusive; if Congress had intended separate categories, the IMD exclusion from services in other types of facilities would be unnecessary and illogical.

Other provisions of the Act make it clear that services performed for the mentally ill may be covered, provided the services are performed in a hospital, a skilled nursing facility, or an ICF that is not an IMD.   Thus, the definition of an ICF expressly describes persons "who because of their mental or

---

[10] *Harris* v. *McRae*, 448 U. S. 297, 301 (1980).

[11] 42 U. S. C. §§ 1396, 1396a.

[12] See § 1905(a) of the Act, 42 U. S. C. § 1396d(a) (1982 ed. and Supp. III), as further amended by the Medicare and Medicaid Budget Reconciliation Amendments of 1984, Pub. L. 98–369, § 2335(f), 98 Stat. 1091.

[13] The definitions of these three categories of service read as follows:

"The term 'medical assistance' means payment of part or all of the cost of the following care and services . . . for individuals[:] . . .

.          .          .          .          .

"(1) inpatient hospital services *(other than services in an institution for mental diseases);*

.          .          .          .          .

"(4)(A)  skilled nursing facility services *(other than services in an institution for mental diseases)* for individuals 21 years of age or older . . . ;

.          .          .          .          .

"(15) intermediate care facility services *(other than such services in an institution for mental diseases)* for individuals who are determined . . . to be in need of such care. . . ."   42 U. S. C. §§ 1396d(a)(1), (a)(4)(A), (a)(15) (1982 ed., Supp. III) (emphasis added).

physical condition" require institutional care but do not need the level of services provided by a skilled nursing facility or a hospital.[14]   And § 1396d(a)(18)(B) prohibits medical assistance for services to individuals under 65 who are patients in IMDs, while another provision, § 1396d(a)(14), also allows such payments for "inpatient hospital services, skilled nursing facility services, and intermediate care facility services for individuals 65 years of age or over in an institution for mental diseases."   To accept the State's interpretation would render the language of § 1396d(a)(14) unnecessary and would render lifeless Congress' approval of ICF services for persons 65 or over in IMDs.[15]

Thus, there is ample textual support for the conclusion that an ICF may be an IMD.

## II

In the absence of a statutory definition of the term "institution for mental diseases," it is appropriate to consider the Secretary's interpretation of that term.[16]

---

[14] Section 1905(c) of the Act, as set forth in 42 U. S. C. § 1396d(c), provides in part:

"For purposes of this subchapter the term 'intermediate care facility' means an institution which (1) is licensed under State law to provide, on a regular basis, health-related care and services to individuals who do not require the degree of care and treatment which a hospital or skilled nursing facility is designed to provide, but who because of their mental or physical condition require care and services (above the level of room and board) which can be made available to them only through institutional facilities . . . .   The term 'intermediate care facility' also includes any skilled nursing facility or hospital which meets the requirements of the proceeding *[sic]* sentence. . . . With respect to services furnished to individuals under age 65, the term 'intermediate care facility' shall not include, except as provided in subsection (d) of this section, any public institution or distinct part thereof for mental diseases or mental defects."

[15] It is a familiar principle of statutory construction that courts should give effect, if possible, to every word that Congress has used in a statute. See, *e. g., Reiter* v. *Sonotone Corp.,* 442 U. S. 330, 339 (1979).

[16] Cf. *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.,* 467 U. S. 837, 843–845 (1984).   The Act expressly provides the Secre-

The Secretary's initial definition was provided shortly after the Medicaid program was enacted in 1965. It stated:

"Any individual who has not attained 65 years of age and is a patient in an institution for . . . mental diseases; *i. e., an institution whose overall character is that of a facility established and maintained primarily for the care and treatment of individuals with . . . mental diseases (whether or not it is licensed)."* [17] (Emphasis added.)

A few years later, the Secretary promulgated the following:

"Whether an institution is one for . . . mental diseases will be determined by whether its overall character is that of a facility established and maintained primarily for the care and treatment of individuals with . . . mental diseases (whether licensed or not) . . . .

. . . . .

"'Institution for mental diseases' means an institution which is primarily engaged in providing diagnosis, treatment or care of persons with mental diseases, including medical attention, nursing care and related services." [18]

---

tary with authority to "make and publish such rules and regulations, not inconsistent with" the Act "as may be necessary [for its] efficient administration." 42 U. S. C. § 1302.

[17] U. S. Dept. of Health, Education & Welfare, Handbook of Public Assistance Administration, Supplement D—Medical Assistance Programs Under Title XIX of the Social Security Act, ¶ D–4620.2 (1966). Regulations fashioned shortly thereafter restated the essence of this definition: covered "'[i]npatient hospital services' are those items and services ordinarily furnished by the hospital for the care and treatment of inpatients . . . in an institution maintained primarily for treatment and care of patients with disorders *other than . . . mental diseases."* 45 CFR § 249.10(b)(1) (1970) (emphasis added); see also § 249.10(b)(4)(i) (skilled nursing home services are "those items and services furnished by a skilled nursing home maintained primarily for the care and treatment of inpatients with disorders other than . . . mental diseases").

[18] 45 CFR §§ 248.60(a)(3)(ii) and (b)(7) (1972).

The current definition[19]—like the earlier versions—is essentially the same as the original definition developed almost two decades ago.[20] In both the earliest and the later interpretations of "institution for mental diseases," the Secretary consistently emphasized the "overall character" of the facility when defining an IMD.

Congress has never indicated dissatisfaction with the Secretary's undeviating construction. "We have often noted that the interpretation of an agency charged with the administration of a statute is entitled to substantial deference." *Blum* v. *Bacon*, 457 U. S. 132, 141 (1982). Moreover, the agency's construction need not be the only reasonable one in order to gain judicial approval.[21] It follows that the Secretary was authorized to determine that medical assistance is not available if the overall character of a facility discloses that it is maintained primarily for the care and treatment of individuals with mental diseases. We must therefore reject the State's suggestion that ICFs and skilled nursing facilities that are primarily engaged in the care of the mentally ill are not "institutions for mental diseases" within the meaning of the Act.[22]

---

[19] See n. 5, *supra*.

[20] The State recognizes that the "substance of these provisions has not changed materially since their first adoption." Brief for Petitioner 8.

[21] See *Unemployment Compensation Comm'n of Alaska* v. *Aragon*, 329 U. S. 143, 153 (1946); see also *American Paper Institute, Inc.* v. *American Electric Power Service Corp.*, 461 U. S. 402, 423 (1983) ("We need only conclude that [the agency's interpretation] is a reasonable interpretation of the relevant provisions").

[22] The State also contends that the disallowance undermines the cooperative federalism concept on which the public assistance programs are based. More specifically, the State argues that the disallowance was based on an interpretation of the Act that did not crystallize until after it had received and spent the federal money. In our view, the Secretary's position has been established with sufficient clarity at least since the 1972 regulations to make this argument untenable. The general policy of federal-state cooperation that underlies the entire program does favor a liberal interpretation of the eligibility provisions of the Act, but as is true of the policy favoring the development of less restrictive treatment programs for

## III

The Medicaid program as enacted in 1965 provided coverage for elderly patients in IMDs, but also contained an express exclusion for patients under 65 years of age in IMDs.[23] The Report of the Senate Committee on Finance made it clear that the IMD exclusion applied to both public and private mental institutions, and explained that it was based on the view that long-term care in mental institutions was a state responsibility.[24]

The Committee Report also explained that the decision to provide federal financial assistance to the mentally ill who were 65 years of age or over was based in part on the requirement that the state plan would include adequate provision for individual review of a patient's needs.[25]   Moreover, the

the mentally ill that is reflected in the "Long Amendment," see *infra,* this page and 534, we must nevertheless respect the apparent limits that Congress has placed on its own decision to fund the implementation of sound policy.

[23] 79 Stat. 352.   The statute provided that the term "medical assistance" did not include

"(A) any such payments with respect to care or services for any individual who is an inmate of a public institution (except as a patient in a medical institution); or

"(B) any such payments with respect to care or services for any individual who has not attained 65 years of age and who is a patient in an institution for tuberculosis or mental diseases." *Ibid.*

The statute also contained a prohibition against payments for certain services rendered in IMDs. *Id.*, at 351–352.

[24] The Report stated:

"Since the enactment of the Social Security Act, patients in public mental and tuberculosis hospitals have not been eligible under the public assistance titles of the Social Security Act, and only prior to 1951 were individuals eligible who were patients in private mental and tuberculosis hospitals.   The reason for this exclusion was that long-term care in such hospitals had traditionally been accepted as a responsibility of the States." S. Rep. No. 404, 89th Cong., 1st Sess., pt. 1, p. 144 (1965).

See also H. R. Rep. No. 213, 89th Cong., 1st Sess., 126 (1965).

[25] The Senate Report continued:

"A second safeguard, under the committee's bill, is a provision that the State plan include a provision for an individual plan for each patient in

Report stated that States had to develop and to implement comprehensive mental health programs.[26]   These latter conditions are components of the "Long Amendment," and provide support for the State's contention that federal policy favors the transfer of patients—at least the elderly—from IMDs to less restrictive treatment facilities.[27]

---

the mental hospital to assure that the care provided to him is in his best interests and that there will be initial and periodic review of his medical and other needs.   The committee is particularly concerned that the patient receive care and treatment designed to meet his particular needs.   Thus, under the committee bill, the State plan would also need to assure that the medical care needed by the patient will be provided him and that other needs considered essential will be met and that there will be periodic redetermination of the need for the individual to be in the hospital.

.          .          .          .          .

"The committee believes that responsibility for the treatment of persons in mental hospitals—whether or not they be assistance recipients—is that of the mental health agency of the State."   S. Rep. No. 404, 89th Cong., 1st Sess., pt. 1, pp. 145–146 (1965).

See also H. R. Rep. No. 213, 89th Cong., 1st Sess., 128 (1965).

[26] The Report further stated:

"The committee believes it is important that States move ahead promptly to develop comprehensive mental health plans as contemplated in the Community Mental Health Centers Act of 1963.   In order to make certain that the planning required by the committee's bill will become a part of the overall State mental health planning under the Community Mental Health Centers Act of 1963, the committee's bill makes the approvability of a State's plan for assistance for aged individuals in mental hospitals dependent upon a showing of satisfactory progress toward developing and implementing a comprehensive mental health program—including utilization of community mental health centers, nursing homes, and other alternative forms of care."   S. Rep. No. 404, 89th Cong., 1st Sess., pt. 1, p. 146 (1965).

See also H. R. Rep. No. 213, 89th Cong., 1st Sess., 129 (1965).

[27] See 110 Cong. Rec. 21346–21348 (1964); 79 Stat. 347; 42 U. S. C. §§ 1396a(a)(20), 1396a(a)(21).   Commenting on the "Long Amendment," the Senate Report stated, in part:

"The committee bill provides for the development in the State of alternative methods of care and requires that the maximum use be made of the existing resources in the community which offer ways of caring for the

In 1967, without amending the Medicaid statute, Congress expanded the aid programs for the aged, blind, and disabled by authorizing federal reimbursement for the cost of services in ICFs.[28]   The 1967 amendments do not expressly mention IMDs.[29]   Four years later, in 1971, Congress adopted the amendment to the Medicaid statute that enlarged the definition of covered medical services to include services performed by ICFs.   The amendments retained the IMD exclusion, an exclusion that remains in the Act today.[30]

The next year, Congress added coverage for "inpatient psychiatric hospital services for individuals under 21."[31]   In its deliberations on the 1972 amendments, Congress also considered the desirability of extending Medicaid "mental hospi-

---

mentally ill who are not in hospitals.   This is intended to include provision for persons who no longer need care in hospitals and who can, with financial help and social services to the extent needed, make their way in the community."   S. Rep. No. 404, 89th Cong., 1st Sess., pt. 1, p. 146 (1965). See also H. R. Rep. No. 213, 89th Cong., 1st Sess., 128 (1965).

[28] 81 Stat. 920–921.

[29] The amendments did, however, provide:

"(d) Except when inconsistent with the purposes of this section or contrary to any provision of this section, any modification, pursuant to this section, of an approved State plan shall be subject to the same conditions, limitations, rights, and obligations as obtain with respect to such approved State plan."   *Id.*, at 920.

The amendments were not actually signed until January 2, 1968, but are generally described as the "1967 amendments."

[30] 85 Stat. 809.   The amendment also contained a definition of the term "intermediate care facility" that largely tracks the language contained in the 1967 amendments.   That definition, however, contained this comment on services for persons under age 65:

"With respect to services furnished to individuals under age 65, the term 'intermediate care facility' shall not include, except as provided in subsection (d), any public institution or distinct part thereof for mental diseases or mental defects."   *Ibid.*

A straightforward reading of this sentence strongly implies that a *private* institution for mental diseases may qualify as an ICF.

[31] 86 Stat. 1460–1461.

tal coverage" to persons between the ages of 21 and 65, but decided not to do so.[32]  See *Schweiker* v. *Wilson*, 450 U. S. 221, 236 (1981).[33]

The State points to several aspects of this lengthy legislative history to support its argument that the exception for IMDs should be narrowly construed to encompass only traditional custodial mental hospitals.  It places special emphasis on the "Long Amendment," which surely indicates that federal policy favors the transfer of mentally ill patients to alternative and less restrictive care facilities when feasible.  It also notes that when federal assistance for ICFs was first authorized in 1967, no express exclusion for IMDs was made, and that the text of the Act plainly contemplates that ICF services will be provided for the mentally ill.  Finally, it points to a number of comments by legislators indicating that they assumed that the IMD exclusion only referred to traditional mental hospitals.

The history on which the State relies does clearly establish that an individual is not ineligible for Medicaid simply because his need for care is based on a diagnosis of mental illness.  Moreover, it is perfectly clear that hospitals, skilled nursing facilities, and intermediate care facilities are not ineligible simply because they provide care and treatment for mentally ill patients.  However, the legislative history also

---

[32] The Senate Report on the bill contains this statement:

"The committee also believes that the potential social and economic benefits of extending medicaid inpatient mental hospital coverage to mentally ill persons between the ages of 21 and 65 deserves to be evaluated and has therefore authorized demonstration projects for this purpose." S. Rep. No. 92–1230, p. 281 (1972).

See also *id.*, at 57.  The proposal was, however, rejected in conference. H. R. Conf. Rep. No. 92–1605, p. 65 (1972).

[33] Although the history of the IMD exclusion in various amendments to the Act suggests that Congress may have assumed that it would refer primarily to public institutions, the State does not argue that it is so confined. We are confident that Congress would have used the term "public" if it had not intended the exclusion to encompass private institutions as well.

demonstrates that Congress has thrice since 1965 not accepted proposals to lift the IMD exclusion for persons under 65.[34]   But most damaging to the State's position is a statement by Congress from the legislative history of the 1972 amendments, which authorized Medicaid funding *for ICF services for the elderly in IMDs*.[35]   In explaining this amendment, the Conference Report stated:

> "The Senate amendment added a new section to the House bill which provided that when a State chooses to cover individuals age 65 and over in institutions for . . . mental diseases it must cover such care in intermediate care facilities as well as in hospitals and skilled nursing homes."[36]

This statement of congressional intent is consistent with the plain language of the statute and with the Secretary's long-standing administrative interpretation: hospitals, skilled nursing facilities, and ICFs can be IMDs and the terms are not mutually exclusive.

The State has persuasively argued that its position represents sound and enlightened policy.   It has not, however, established that Congress has only excluded "hospitals" in which a mental illness is treated instead of *"institutions* for

---

[34] See Social Security Amendments of 1971: Hearings on H. R. 1 before the Senate Committee on Finance, 92d Cong., 1st and 2d Sess., pt. 2, pp. 924–941 (1972) (statements of Dr. Jonathan Leopold, Commissioner, Vermont Dept. of Mental Health, and Dr. Kenneth Gaver, Commissioner, Ohio Dept. of Mental Hygiene and Corrections); Social Security Amendments of 1970: Hearings on H. R. 17550 before the Senate Committee on Finance, 91st Cong., 2d Sess., pt. 2, pp. 500–550 (1970); Social Security Amendments of 1967: Hearings on H. R. 12080 before the Senate Committee on Finance, 90th Cong., 1st Sess., pt. 3, p. 1741 (1967) (statement of Dr. Robert W. Gibson, American Psychiatric Association).

[35] The 1971 amendments were technically corrected to explain that the IMD exclusion did not prevent reimbursement for ICF services provided to the elderly in IMDs.   86 Stat. 1329, 1459–1460; S. Rep. No. 92–1230, pp. 320–321 (1972).

[36] H. R. Conf. Rep. No. 92–1605, p. 64 (1972).

mental diseases." The express authorization for coverage of individuals 65 years of age or over uses language that plainly indicates that a hospital, a skilled nursing facility, or an ICF may be an IMD; this indication is unambiguously confirmed by the fact that the same parenthetical exclusion for IMDs applies to all three types of facilities. Moreover, the Secretary's interpretation of "institution for mental diseases" comports with the plain language of the statute. Finally, the legislative history does not reveal any clear expression of contrary congressional intent.

The judgment of the Court of Appeals is affirmed.

*It is so ordered.*