**BAPTIST HOSPITAL EAST, et al.,
Plaintiffs-Appellants,**

v.

**SECRETARY OF HEALTH AND
HUMAN SERVICES,
Defendant-Appellee.**

**No. 85–5473.**

United States Court of Appeals,
Sixth Circuit.

Argued March 11, 1986.
Decided Oct. 6, 1986.

Gaylee W. Gillim, Rice, Porter and Seiller, Louisville, Ky., Carson P. Porter (argued), for plaintiffs-appellants.

Ronald E. Meredith, U.S. Atty., Louisville, Ky., Mark A. Guza (argued), Asst. Regional Atty., Dept. of H.H.S., Atlanta, Ga., for defendant-appellee.

Before ENGEL and MILBURN, Circuit Judges and CONTIE,* Senior Circuit Judge.

ENGEL, Circuit Judge.

Appellants, five non-profit hospitals, are all providers of health care services under the Medicare program who, during the relevant period, provided some free health care to non-Medicare patients. These services were accounted for by the hospitals as either bad debts, charity or courtesy allowances.[1] The hospitals now seek reimbursement from the Medicare program for a portion of these services. They appeal a decision of the United States District Court for the Western District of Kentucky upholding 42 C.F.R. § 405.420 under which the Secretary of Health and Human Services denied their claims for reimbursement. We agree with Chief Judge Charles M. Allen that a provider's self-disallowance is not a matter covered by its cost report and does not preserve the jurisdiction of the Provider Reimbursement Review Board with respect to the self-disallowance, that section 405.420 does not conflict with the reasonable cost provisions of the Medicare Act, 42 U.S.C. § 1395x(v)(1)(A), and that section 405.420 does not violate the due process clause of the Fifth Amendment.

## I.

To recover costs incurred in providing health care services to Medicare recipients, a provider must file a cost report with the Department of Health and Human Services, usually through a private insurance company acting as an agent for the Secretary and denominated a "fiscal intermediary." The appellants, in filing their cost reports with their fiscal intermediary, claimed compensation from the Medicare program for a portion of their bad debts, charity and courtesy allowances, while one appellant, William Booth Memorial Hospital, self-disallowed reimbursement for its free services on its cost report for fiscal 1981.[2] The fiscal intermediary rejected the claims for reimbursement for bad debts, charity and courtesy allowances in accordance with 42 C.F.R. § 405.420(b). The providers appealed as part of a group appeal from these denials to the Provider Reimbursement Review Board pursuant to 42 U.S.C. § 1395oo, challenging 42 C.F.R. § 405.420 and seeking expedited judicial review. Booth Memorial, along with other providers who had not claimed recovery for bad debts, charity and courtesy allowances sought to join the appeal to the Board.

The Board dismissed the appeals of several hospitals on the ground that it lacked jurisdiction to hear a claim not initially raised with the fiscal intermediary. It granted the remaining hospitals' request for expedited judicial review under 42 U.S.C. § 1395oo (f)(1) since only a controlling question of law, which the Board was not empowered to decide, remained at is-

---

* Judge Leroy J. Contie took senior status on July 1, 1986.

1. The Secretary has defined bad debts, charity and courtesy allowances as follows:
   (b) Definitions—(1) Bad debts. Bad debts are amounts considered to be uncollectible from accounts and notes receivable which were created or acquired in providing services. "Accounts receivable" and "notes receivable" are designations for claims arising from the rendering of services, and are collectible in money in the relatively near future.
   (2) Charity allowances. Charity allowances are reductions in charges made by the provider of services because of the indigence or medical indigence of the patient. Cost of free care (uncompensated services) furnished under a Hill-Burton obligation are considered as charity allowances.

(3) Courtesy allowances. Courtesy allowances indicate a reduction in charges in the form of an allowance to physicians, clergy, members of religious orders, and others as approved by the governing body of the provider, for services received from the provider. Employee fringe benefits, such as hospitalization and personnel health programs, are not considered to be courtesy allowances. 42 C.F.R. § 405.420(b).

2. To self-disallow a cost, the provider lists that cost on Worksheet A-8 (adjustments to expenses) of its cost report, "but does not request reimbursement for that item because it believes that reimbursement is barred by the Medicare regulations." *Athens Community Hosp., Inc. v. Schweiker,* 743 F.2d 1, 5 (D.C.Cir.1984).

sue. The providers then filed suit in the district court.

The district court granted summary judgment against those hospitals, including Booth, which did not expressly claim reimbursement for their free services but made self-disallowing adjustments. It held that those hospitals had failed to satisfy the jurisdictional prerequisites for appeal to the Board.

[A] mere self-disallowance, which is no more than setting out a figure on a cost report without claiming it, is insufficient to preserve the jurisdiction of the Board to consider that item for reimbursement purposes.... A provider simply cannot request reimbursement from the Board for an item which it did not even claim from its fiscal intermediary before receiving its NPR.

The court further upheld the challenged regulations as "entirely consistent" with the Medicare Act and as not in violation of the Fifth Amendment due process clause.

On appeal, the hospitals argue that bad debts and charity allowances are necessary costs of hospital operation, a portion of which are indirectly attributable to the Medicare program and are accordingly recoverable as reasonable costs under 42 U.S.C. § 1395x(v)(1)(A).[3] They contend that 42 C.F.R. § 405.420, which precludes recovery for general bad debts and charity allowances, is inconsistent with the reasonable cost provisions of the Act. They further contend that 42 C.F.R. § 405.420, to the extent it does not compensate the hospitals for costs of operation attributable to the Medicare program, effects a taking

without compensation in violation of the due process clause of the Fifth Amendment. William Booth Memorial Hospital also contends that its self-disallowance of reimbursement for free services provided sufficient notice to preserve its right to appeal to the Board under section 1395oo.

## II.

The review process for the claims of Medicare providers is established through 42 U.S.C. § 1395oo, in which Congress created the Provider Reimbursement Review Board.[4] Booth contends that the Board has jurisdiction under section 1395oo to review the cost items that Booth self-disallowed since under that section the Board may "make any other revisions on matters covered by such cost report ... even though such matters were not considered by the intermediary in making such final determination." Booth argues that the items it self-disallowed may be reviewed by the Board as items covered in the cost report and not considered by the intermediary.

█ There is a division of authority on this issue both within the circuits and within the district courts of this circuit. This circuit has held, though, that section 1395 oo "requires that a provider include disputed issues within the initial cost report and preserves the right of review if the intermediary ignores the claim, or instructs the provider to delete the claim.... The provider is not entitled to compel the Board to review *new* claims." *Saline Community Hosp. Ass'n v. Secretary of H.H.S.*, 744 F.2d 517, 519 (6th Cir.1984) (per curiam)

---

**3.** At oral argument, appellants relinquished their claim for recovery on courtesy allowances.

**4.** Section 1395oo states:

(a) Any provider of services which has filed a required cost report within the time specified in regulations may obtain a hearing with respect to such cost report by a Provider Reimbursement Review Board ... if—

(1) such provider—

(A)(i) is dissatisfied with a final determination of the organization serving as its fiscal intermediary ... as to the amount of total program reimbursement due the provider for the items and services furnished to individu-

als for which payment may be made under this subchapter for the period covered by such report....

(d) ... The Board shall have the power to affirm, modify, or reverse a final determination of the fiscal intermediary with respect to a cost report and to make any other revisions on matters covered by such cost report (including revisions adverse to the provider of services) even though such matters were not considered by the intermediary in making such final determination.

42 U.S.C. § 1395oo(a)(1)(A)(i) and (d).

(original emphasis). By self-disallowing its bad debts, charity and courtesy allowances Booth did not claim them; on the contrary, through self-disallowance without an accompanying challenge, Booth expressly disclaimed entitlement to reimbursement. We do not believe that a mere self-disallowance even when made solely to conform to regulations with which a provider disagrees raises a claim within the meaning of *Saline* sufficient to preserve the issue for review by the Provider Reimbursement Review Board.

In *Athens Community Hosp., Inc. v. Schweiker*, 743 F.2d 1 (D.C.Cir.1984) (*Athens II*), the D.C. Circuit held that "the PRRB has jurisdiction over costs that are specifically claimed—meaning that the provider requested reimbursement in a timely manner—as well as those cost issues raised by a provider prior to the intermediary's issuance of the NPR." *Id.* at 5–6. The court rejected the interpretation of section 1395*oo* stated by the Seventh Circuit in *St. Mary of Nazareth Hosp. Center v. Department of H.H.S.*, 698 F.2d 1337 (7th Cir.), *cert. denied*, 464 U.S. 830, 104 S.Ct. 107, 78 L.Ed.2d 110 (1983), which granted jurisdiction to the Board over all matters whether or not disclosed in the cost report.[5] It held that that interpretation would render meaningless the statute's provision for revision by the Board of "matters covered by [a] cost report." *Athens II*, 743 F.2d at 6. The court further held that section 1395*oo* does not grant jurisdiction to the Board over items self-disallowed on the cost report. It concluded that any other interpretation would put "an irrational gloss on the statute." *Id.*

It simply is not plausible to contend that Congress has created a scheme where the provider can claim dissatisfaction and have recourse to an appeal procedure

because the intermediary failed to read the provider's mind and anticipate all those things the provider would like to be reimbursed for, even though it did not request them.

*Id.* Moreover, it concluded that such an interpretation would place an overwhelming burden of identifying reimbursable costs on the intermediary.

Thus a provider could list every conceivable cost on its cost report, without claiming reimbursement, and hope that the intermediary will reimburse it for the reported but unclaimed costs, secure that it nevertheless will have until 180 days following the NPR to concoct some reasons to urge upon the PRRB for reimbursement of the unclaimed costs.

*Id.* It noted that permitting de novo claims at the Board level would generate baseless appeals and that such an interpretation runs counter to the process of progressive narrowing of issues reflected in the procedures for reopening a cost report.

■ We note that in the instant case Booth self-disallowed its bad debts and charity allowances simply because it was compelled to do so under the regulations. We further recognize that the intermediary has no authority to alter the Secretary's regulations governing reimbursement but must faithfully apply them as they stand. This is not a case, then, where extending jurisdiction over costs not claimed in the report would saddle the intermediary with an additional obligation. If the Board's jurisdiction were extended to this type of case, the Board would not have to search out unclaimed costs that were disallowed under close regulatory directives since, even if it had considered these costs, it could not have awarded reimbursement for them. Moreover, we recognize that in this

---

**5.** The Seventh Circuit in *St. Mary* stated that "the statute allows the Board to consider matters outside of the cost reports...." 698 F.2d at 1346. This statement, as the D.C. Circuit noted, ignores the second part of the jurisdictional grant in section 1395*oo*. The holding of *St. Mary*, however, is not necessarily so broad. *See St. Luke's Hosp. v. Secretary of H.H.S.*, 632 F.Supp. 1387 (D.Mass.1986). In *St. Mary*, the provider had self-disallowed the costs for which it was seeking Board review. Accordingly, *St. Mary* could be limited to the proposition that section 1395*oo* extends Board jurisdiction to costs which were self-disallowed as "matters covered by [the] cost report...." As noted below, we agree with the D.C. Circuit that even this interpretation of section 1395*oo* is unwarranted.

situation, requiring a provider to claim reimbursement does not serve the purpose generally served by exhaustion requirements. Since the intermediary cannot review the Secretary's regulations, it cannot offer the assistance of its analysis. *See Bethesda Hosp. v. Heckler*, 609 F.Supp. 1360, 1368 (S.D.Ohio 1985). Booth's interpretation of section 1395*oo* does not in these circumstances "deprive [the PRRB] of the intermediary's analysis and conclusions and make the PRRB the tribunal of original jurisdiction, eliminating a tier of review, and possibly substantially slowing the reimbursement process for other providers." *Athens Community Hosp., Inc. v. Schweiker*, 686 F.2d 989, 997 (D.C. Cir. 1982) (*Athens I*), *modified*, 743 F.2d 1 (1984).

Nonetheless, even if we see little reason for requiring a provider to raise a claim before a body that cannot address it, we are not free to design an agency process for review of intermediary decisions on cost reports, but are bound to apply Congress' intent where it can be determined and to defer to the Secretary's interpretation where it is reasonable. We agree with the D.C. Circuit that the interpretation stated by the Seventh Circuit renders the second part of the jurisdictional grant meaningless. Moreover, we agree that the interpretation which grants jurisdiction over costs for which the provider did not seek reimbursement places an irrational gloss on the statute. The interpretation adopted in *Athens II* and applied by the Board in

this and other cases, in contrast, does no damage to the language of the statute and serves a beneficial procedural purpose. Under *Athens II* and the Board's interpretation, a provider is required to present a coherent claim for reimbursement at the time it files its cost report. It may not present claims to its intermediary, await the intermediary's decision, and then decide based upon its success before the intermediary whether to raise additional claims before the Board. "This procedure would ... render virtually meaningless the time limits for the filing of cost reports established by Medicare regulations." *Athens II*, 743 F.2d at 7.[6] Finally, we note that the interpretation adopted here does not place the provider at any disadvantage for exercising its right to challenge in good faith regulations which it believes are in conflict with their statutory underpinnings.[7] The Provider Reimbursement Manual states that there will be no referral to the U.S. Attorney for criminal and/or civil prosecution of a provider where the provider has claimed reimbursement for disallowed costs so long as "[t]he provider clearly indicates this item(s) is being included in the cost report only to establish the basis for an appeal and each disputed item and amount is specifically identified." P.R. Manual § 2425.1. Moreover, under the reasoning of *Athens II*, a provider is able to appeal to the Board when it has self-disallowed a cost but also timely indicated its disagreement with and challenge to the

---

6. In *Bethesda*, Judge Spiegel expressed concern that the interpretation of section 1395*oo* adopted in *Athens II* would preclude review by the Board and the courts of errors made by an intermediary in favor of a provider. We do not fear such a result. Section 1395*oo*, permits the Board to make "revisions adverse to the provider of services." This provision clearly allows the Board to reach issues not raised by the provider in its appeal. It is not inconsistent with the requirement that a provider claim a cost with its intermediary before seeking reimbursement for that cost at the Board. It simply allows the Board to make any revisions to the NPR mandated by its decision on the issue appealed, regardless of whether that revision was raised as an issue by the provider. Thus, if the provider appeals the denial of one claim and the Board's reversal of the intermediary's denial

would necessitate a revision of other claims, the Board is empowered to make those revisions.

7. Several courts have expressed concern that requiring a provider to claim a cost as a prerequisite to Board and judicial review places the provider in an untenable position when the cost has previously been denied by its intermediary or the Secretary. *See St. Luke's Hosp. v. Secretary of H.H.S.*, 632 F.Supp. 1387 (D.Mass.1986); *Community Hosp. of Roanoke Valley v. Heckler*, 588 F.Supp. 674, 678 (D.Va.1984), *aff'd in part and rev'd in part*, 770 F.2d 1257 (4th Cir.1985); *Adams House Health Care v. Heckler*, 604 F.Supp. 110, 115 (N.D.Cal.1984); *Our Lady of Lourdes Memorial Hosp. v. Schweiker*, No. 80-CV-226 slip op. (N.D.N.Y. July 26, 1982).

regulations or rulings compelling the self-disallowance.

██ In the present case, Booth did not claim reimbursement for its bad debts and charity or courtesy allowances in its initial cost report but instead self-disallowed reimbursement for those matters and did not challenge the regulations under which it self-disallowed. Accordingly, Booth's bad debts and charity and courtesy allowances are not claims and the Board lacked jurisdiction to consider them.

## III.

Those hospitals that did claim reimbursement on their cost reports for their charity allowances and bad debts contend that 42 C.F.R. § 405.420 is inconsistent with the reasonable cost provisions of the Medicare Act.

The Medicare Act allows for the payment of, at most, the "reasonable cost" of health care services to providers who charge the public more than a nominal sum for such services. 42 U.S.C. § 1395f(b).[8] Congress defined "reasonable cost" as the amount actually incurred and necessary to the efficient delivery of needed health services. 42 U.S.C. § 1395x(v)(1)(A).[9] Congress left the implementation of this definition to the Secretary, but required that any regulations account for indirect as well as direct costs and further provided:

> [T]he necessary costs of efficiently delivering covered services to individuals covered by the insurance programs ... will not be borne by individuals not so covered, and the costs with respect to individuals not so covered will not be borne by such insurance programs....

42 U.S.C. § 1395x(v)(1)(A)(i).[10]

The hospitals argue that "the legislative history is clear" that through the Medicare

8. At the time the hospitals filed their cost reports, section 1395f(b) provided:

The amount paid to any provider of services (other than a hospice program providing hospice care) with respect to services for which payment may be made under this part shall, subject to the provisions of sections 1395e and 1395ww of this title, be—

(1) except as provided in paragraph (3), the lesser of (A) the reasonable cost of such services, as determined under section 1395x(v) of this title and as further limited by section 1395rr(b)(2)(B) of this title, or (B) the customary charges with respect to such services....

9. 42 U.S.C. § 1395x(v)(1)(A) provides:

(1)(A) The reasonable cost of any services shall be the cost actually incurred, excluding therefrom any part of incurred cost found to be unnecessary in the efficient delivery of needed health services.... Such regulations [establishing the method to determine costs] shall (i) take into account both direct and indirect costs of providers of services ... in order that, under the methods of determining costs, the necessary costs of efficiently delivering covered services to individuals covered by the insurance programs established by this subchapter will not be borne by individuals not so covered, and the costs with respect to individuals not so covered will not be borne by such insurance programs, and (ii) provide for the making of suitable retroactive corrective adjustments where, for a provider of services for any fiscal period, the aggregate reimbursement produced by the methods of determining costs proves to be either inadequate or excessive.

10. Pursuant to this authority, the Secretary promulgated the following regulations:

(a) *Principle.* Bad debts, charity, and courtesy allowances are deductions from revenue and are not to be included in allowable cost; however, bad debts attributable to the deductibles and coinsurance amounts are reimbursable under the program....

(d) *Requirements for title XVIII.* Under Title XVIII of the Act, costs of covered services furnished beneficiaries are not to be borne by individuals not covered by the health insurance program, and conversely, costs of services provided for other than beneficiaries are not to be borne by the health insurance program. Uncollected revenue related to services rendered to beneficiaries of the program generally means the provider has not recovered the cost of services covered by that revenue. The failure of beneficiaries to pay the deductible and coinsurance amounts can result in the related costs of covered services being borne by other than beneficiaries of title XVIII. To assure that such covered service costs are not borne by others, the costs attributable to the deductible and coinsurance amounts which remain unpaid are added to the title XVIII share of allowable costs. Bad debts arising from other sources are not allowable costs.

(e) *Criteria for allowable bad debt.* A bad debt must meet the following criteria to be allowable:

(1) The debt must be related to covered services and derived from deductible and coinsurance amounts.

Act Congress "intended to pay actual costs to meet the financial requirements of efficiently operating and maintaining a hospital." They maintain that their bad debts and charity allowances are actual indirect costs which must be recovered to operate a hospital efficiently and therefore are necessary to effectively deliver needed health care services to individuals covered by the Medicare program. Consequently, they contend that bad debts and charity allowances fall within the definition of reasonable costs and that the regulations disallowing partial reimbursement for bad debts and charity are inconsistent with the Act. The Secretary, though, contends that these are not actual costs attributable to health care services provided to recipients of Medicare assistance and that the system of allocating costs under the existing regulations is not inconsistent with the Act.

▮ When construing the Medicare Act, we must defer to the interpretation made by the Department of Health and Human Services as the agency charged with administration of the statute. *See Schweiker v. Hogan,* 457 U.S. 569, 588, 102 S.Ct. 2597, 2608–09, 73 L.Ed.2d 227 (1982). The Secretary's interpretation must be analyzed in light of the statute's language, purpose and history, and should be upheld if it is reasonable, consistent with the statutory mandate and does not frustrate the policy that Congress sought to implement. *Southeastern Community College v. Davis,* 442 U.S. 397, 99 S.Ct. 2361, 60 L.Ed.2d 980, (1979); *Connecticut Dept. of Income Maintenance v. Heckler,* 471 U.S. 524, 105 S.Ct. 2210, 2215 n. 21 85 L.Ed.2d 577 (1985); *State of Ohio v. United States Dept. of Health & Human Serv.,* 761 F.2d 1187, 1193 (6th Cir.1985).

▮ The Seventh Circuit has held that the regulations challenged here are "in complete harmony with both the letter and the spirit of the statute...." *St. Francis Hosp. Center v. Heckler,* 714 F.2d 872, 887 (7th Cir.1983), *cert. denied,* 465 U.S. 1022, 104 S.Ct. 1274, 79 L.Ed.2d 679 (1984). We agree. The Secretary's regulations permit hospitals to recover from the Medicare program the uncollectible receipts, whether accounted for as bad debts or charity allowances, that are due from Medicare patients themselves. The Secretary has thus ensured that health care providers will not operate at a loss on the services provided to Medicare insureds. Congress did not require the Medicare program to reimburse health care providers for the proportion of their bad debts and charity allowances equal to the proportion of their patients who are Medicare insureds. That this might also be a reasonable scheme under the Act is not relevant. We need only consider whether the Secretary's regulations are reasonable in light of the Act; they need not be the only reasonable application of the Act. *Connecticut Dept. of Income Maintenance,* 105 S.Ct. at 2215. The characterization of bad debts and charity allowances as reductions in revenue rather than operating costs, and the Secretary's decision to pay the bad debts and free care costs of Medicare patients and to deny reimbursement for bad debts and free care of non-Medicare patients, is not an unreasonable scheme for allocating health care costs and does not conflict with the meaning of section 1395x(v)(1)(A) as revealed by its language, purpose and history.

The Senate report provides an example of what Congress contemplated would be a reimbursable cost as well as what would not be reimbursable under the Medicare Act. It states that costs incurred by a health care provider pursuant to educational activities would be recoverable under the Medicare program because, "they enhance

---

(2) The provider must be able to establish that reasonable collection efforts were made.
(3) The debt was actually uncollectable when claimed as worthless.
(4) Sound business judgment established that there was no likelihood of recovery at any time in the future....

(g) *Charity allowances.* Charity allowances have no relationship to beneficiaries of the health insurance program and are not allowable costs....
42 C.F.R. § 405.420.

the quality of care in an institution," and are not borne by the community in any other way. S.Rep. No. 404, 89th Cong., 1st Sess., *reprinted in* 1965 U.S.Code Cong. & Ad.News 1943, 1977. However, the report states that recovery would be denied for identifiable expenses for medical research:

> Identifiable expenses for medical research, on the other hand, over and above the costs closely related to normal patient care, would not be met from the trust fund. Available research funds are generally ample to support important basic medical research.

*Id.*

Unquestionably, charity allowances and lost revenues attributable to bad debts reduce a hospital's gross receipts.[11] This will be true whether the particular loss was occasioned by motives of charity, by poor fiscal management, or simply by normal risk-taking inherent in every undertaking. It is also true that uncollected accounts receivable, like increased expenses incurred in providing patient care, can be made up by raising charges for normal patient care. In our judgment these factors do not, however, entitle them to be treated as costs "closely related to normal patient care" as Congress meant that term to be understood in the Medicare Act.

■ The hospitals, in essence, do not complain that the Secretary has refused reimbursement for a portion of the costs that a hospital must incur to properly service all its patients. Rather, they contend that they are not receiving from charges to patients a return sufficient to continue operation of the hospital or engage in improvements. While Congress intended to provide for reimbursement of normal patient care costs, contrary to the hospital's contention, neither the legislative history nor subsequent cases reveals a Congressional intent to guarantee a return from overall hospital functions adequate to en-

sure sustained hospital operation. In enacting the Medicare program, Congress did not primarily seek to ensure the financial viability of individual health care institutions, but sought to ensure adequate health care for a specific group of people.

> We do not find in the statute authorizing Medicare and Medicaid any legislative intention to provide financial assistance to providers of care for their own benefit. Rather, the statute is designed to aid the patients and clients of such facilities.

*Green v. Cashman,* 605 F.2d 945, 946 (6th Cir.1979).

It is evident that when Congress enacted the Medicare program it considered the problems that bad debts and free care pose for health care institutions. It recognized that the program would in reality provide a major source of relief from the risk of economic loss through payments on behalf of the elderly; just as plainly it did not intend to assume the risks incurred in serving those not covered by the program.

> In some cases, the charges hospital patients pay include a share of the cost of rendering services to free and part-pay patients as well as a share of uncollectible bills. The committee has given careful consideration to the question of the effect that the proposed program would have on charges to other paying patients. The insurance system will reduce the losses of hospital income from bad debts or for care of free or part-pay aged patients which might otherwise be included in charges to other paying patients by paying the full cost, except for the deductible and coinsurance, for substantially all patients over 65. Under the public assistance programs now existing and even more as they would exist under the provisions of this bill, the Federal Government will make a very substantial contribution toward the medical care of

---

**11.** The Secretary's regulations do not ignore the need of proprietary hospitals to recover economic costs through a sufficient return on equity. They provide for the payment of a reasonable return on equity either as part of or in addition to reimbursement of reasonable costs.

*See* 42 U.S.C. § 1395x(v)(1)(B), 42 C.F.R. § 405.-429. Congress, however, did not intend nonproprietary facilities, such as appellants, to collect a return on equity capital as part of the "reasonable costs" of providing services. *St. Francis,* 714 F.2d at 875.

the needy of all ages. Under the bill more of the needy could be aided under the Federal-State assistance programs. Further, the proposed amendments would require under the medical assistance and maternal and child health and crippled children programs of the Social Security Act, the payment of the reasonable costs of covered hospital services. This will assist hospitals in reducing income deficits arising out of providing hospital care to persons unable to pay for care. These provisions, taken in combination with the hospital insurance system under part A of title XVIII, will appreciably reduce the need of hospitals to charge their paying and prepaying patients more than the cost of their services in order to compensate for care rendered to other patients without charge or at less than cost. The bill will thus make a contribution toward rationalizing the distribution of hospital costs and relieving voluntary insurance and prepayment systems, as well as those patients who pay for services at the time when they are rendered, of some part of the burden they now bear for indigent and charity patients.

S.Rep. No. 404, 1965 U.S.Code Cong. & Ad.News at 1977–78.

Congress has enacted other programs to help ensure an ample number of health care institutions, *see, e.g.,* 42 U.S.C. § 261a; *Newsom v. Vanderbilt University,* 653 F.2d 1100, 1104–05 (6th Cir.1981), and we have held that the Medicare Act does not also serve that purpose. In the face of arguments similar to those raised here, courts have repeatedly held that free care costs incurred by the health care providers in satisfaction of obligations they assumed in order to receive federal funding under the Hill-Burton Act are not recoverable as reasonable costs under the Medicare program because the Medicare Act was not designed to finance improvements in health care facilities.

[T]hese two Acts as established are two separate and distinct federal programs, each designed to accomplish a distinctly different purpose. The Hill-Burton Act was designed to promote the construction and modernization of hospitals.... The Medicare Act, on the other hand, was adopted only to provide medical care for the disabled and the aged who qualify as Medicare beneficiaries.

*St. Mary,* 698 F.2d at 1343. *See also Harper-Grace Hosps. v. Schweiker,* 691 F.2d 808 (6th Cir.1982), *reh'g denied,* 708 F.2d 199 (6th Cir.1983).

The regulations restricting reimbursement of bad debts and charity allowances to those bad debts and charity allowances arising from a Medicare recipient's failure to pay outstanding medical care costs and characterizing bad debts and charity allowances as reductions in revenue rather than operating costs are not unreasonable. They neither conflict with nor frustrate the Congressional policies underlying section 1395x(v)(1)(A).

**IV.**

In the hospitals' final challenge to 42 C.F.R. § 405.420, they contend that section 405.420 violates the Fifth Amendment due process clause. They contend that the Secretary has denied them just compensation and argue that even public service corporations may not be compelled to operate at a loss.

The just compensation to which the hospitals are entitled is just compensation for providing health care services for Medicare recipients, not just compensation for operating a health care facility. As noted above, section 405.420 adequately compensates for services to Medicare patients, and the Act neither requires nor permits more. Moreover, section 405.420 does not compel any hospital to operate at a loss. The Medicare Act does not require any provider to render free services, nor does it restrain any provider from instituting measures to reduce its volume of bad debts.

Finally, participation in the Medicare program is wholly voluntary. If any provider fears that its participation will drive it to

insolvency, it may withdraw from participation.

The Hospital's argument might well prove persuasive if participation in the Medicare program were mandatory. However, Medicare is a federally sponsored insurance program for the aged and disabled, 42 U.S.C. § 1395c, and provider participation is voluntary, 42 U.S.C. § 1395cc. Providers who opt not to participate are free to serve persons not covered by Medicare and those potential Medicare recipients who are willing to forego Medicare benefits for the services provided. As a practical matter, perhaps a few of those persons eligible for Medicare would choose a non-participating hospital, but the fact that practicalities may in some cases dictate participation does not make participation involuntary. Even those hospitals that have an obligation to participate in the Medicare program because of their receipt of funds under the Hill-Burton Act, 42 U.S.C. § 291; 42 C.F.R. § 124, made a voluntary choice to accept both the obligations and the benefits of Hill-Burton funding. *St. Francis Hosp. Center v. Heckler*, 714 F.2d 872, 875 (7th Cir.1983), *cert. denied*, 465 U.S. 1022, 104 S.Ct. 1274, 79 L.Ed.2d 679 (1984).

The hospitals finally appear to contend, however, that participation in the Medicare program is not truly voluntary because, they argue, they must participate in order to maintain their tax-exempt status. Even if the hospitals have correctly characterized the requirements for tax-exempt status, we do not think that requirement affects either the voluntariness of their participation or the absence of any obligation by the federal government to allay a part of their financial burden resulting from bad debts and acts of charity. The decision to seek tax-exempt status, like the decision to accept Hill-Burton funds, is purely voluntary and any obligations are as freely accepted as the benefits.

AFFIRMED.