110 F.3d 502
 Unempl.Ins.Rep. (CCH) P 22,180
Luella PENNINGTON, individually and on behalf of other
similarly situated persons, Plaintiff-Appellee,
v.
Lynn DOHERTY, Director of the Illinois Department of
Employment Security, in her official capacity,
Defendant-Appellant.
 No. 96-1499.
 United States Court of Appeals,Seventh Circuit.
 Argued Oct. 23, 1996.*
Decided April 4, 1997.
 
 Jeffrey B. Gilbert (argued), Johnson, Jones, Snelling & Gilbert, and Robert E. Lehrer, Lehrer & Redleaf, Chicago, IL, for Plaintiff-Appellee.
 Deborah L. Ahlstrand (argued), Office of the Attorney General, Civil Appeals Division, Chicago, IL, for Defendant-Appellant.
 Before ESCHBACH, RIPPLE and KANNE, Circuit Judges.
 RIPPLE, Circuit Judge.
 
 
 1
 This is a successive appeal. Luella Pennington, the class representative in this § 1983 case, seeks injunctive relief from the operation of one of the provisions of the Illinois Unemployment Insurance Act ("IUIA"), 820 ILCS 405/100 et seq. In PENNINGTON V. DIDRICKSON, 22 F.3D 1376 (7TH CIR.)[1] ("Pennington I"), cert. denied, 513 U.S. 1032, 115 S.Ct. 613, 130 L.Ed.2d 522 (1994), we held that Illinois' method of determining a base period, on which entitlement to benefits was calculated, was not an eligibility requirement, but an administrative provision, of the program. Accordingly, we concluded that the provision was subject to the "when due" clause of section 303(a) of the Social Security Act ("SSA"), 42 U.S.C. § 503(a). We therefore remanded the case to the district court to determine whether section 237 of the IUIA, which sets forth the formula by which Illinois calculates the base period, complies with SSA § 303(a) by ensuring the greatest promptness in paying unemployment benefits. See 22 F.3d at 1387-88. The district court, after accepting further submissions from the parties, concluded that section 237 violates the "when due" clause of the SSA. For the reasons that follow, we affirm the judgment of the district court.
 
 
 2
 * BACKGROUND
 
 A. Facts
 
 3
 Because this case is a successive appeal, we shall assume a familiarity with the facts set forth in our previous opinion, see Pennington I, 22 F.3d at 1378-81, and limit our rendition here to a repetition of those matters most pertinent to the resolution of this appeal.
 
 
 4
 The plaintiffs are claimants for unemployment insurance benefits under the IUIA, Illinois' unemployment insurance program. Their claims have been either delayed or denied because of the manner in which the IUIA defines the term "base period." Section 237 of the IUIA defines "base period" as "the first four of the last five completed calendar quarters immediately preceding the benefit year."[2] 820 ILCS 405/237. For example, for an individual who filed for benefits in June of 1993 (during the second quarter of 1993), the resulting base period under the IUIA would be the four calendar quarters of 1992. Pennington I, 22 F.3d at 1378. The first quarter of 1993 would be the lag quarter, and the second quarter of 1993 would be the filing quarter.
 
 
 5
 In Pennington I, we held that the base period was not an eligibility requirement, as the district court had held it to be and as IDES had maintained. Rather, it is an administrative provision subject to the "when due" clause of the SSA. Section 303(a)(1) of the SSA, the "when due" clause, provides that a state's unemployment insurance law must provide for " 'such methods of administration ... as are found by the Secretary of Labor to be reasonably calculated to insure full payment of unemployment compensation when due.' " Pennington I, 22 F.3d at 1378 (quoting 42 U.S.C. § 503(a)(1)). The Secretary's regulations amplify this statutory provision: The state must implement "such methods of administration as will reasonabl[y] insure the full payment of unemployment benefits to eligible claimants with the greatest promptness that is administratively feasible." 20 C.F.R. § 640.3(a). Had we accepted Illinois' contention in Pennington I that the definition of base period was an eligibility requirement rather than an administrative provision, section 237 would not have been subject to the "when due" clause. See 22 F.3d at 1381 & n. 4.
 
 
 6
 Having determined that the designation of a base period was an administrative provision subject to the "when due" clause, we reversed and remanded the case to the district court to determine, based on the evidence it had and on any further submissions from the parties, "whether section 237 insures the greatest promptness in paying unemployment benefits that is administratively feasible, making all factual findings that it deems necessary to the resolution of that issue." Id. at 1388. To make this determination, we held that it was necessary for the district court "to decide whether section 237's base period strikes a reasonable balance between the plaintiff class's interest in prompt payment of unemployment insurance benefits and the state's interest in minimizing the costs of eliminating delay and in preventing fraudulent claims." Id. at 1387 (internal quotation and citation omitted).
 
 B. District Court Remand
 
 7
 The district court, both in the original proceeding and on remand, had a voluminous record containing evidence and testimony about Illinois' current wage record system and about the plaintiff class' various alternative proposals. Under the current system, section 237 requires an examination of the first four of the five previously completed quarters to determine whether sufficient insured work has been done to award the benefits. These four quarters are the base period under the current system.
 
 
 8
 The alternatives incorporated other base periods which, in the view of the plaintiffs, fulfilled the statutory mandate. An alternative base period ("ABP") looks to a different set of four quarters to determine whether sufficient income was earned. In the ABPs proposed by Ms. Pennington, for example, the ABP for those who did not meet the income requirements of the section 237 base period would be the four completed quarters preceding a claimant's filing of a claim. Under both of the plaintiff class' alternatives, IDES, in determining the benefits for a claimant who did not qualify for benefits under the section 237 base period, would look to the lag quarter and the three preceding quarters to determine the claimant's benefits. The primary difference between the two proposed alternatives is that the second alternative incorporates a wage request system for some of the lag-quarter eligible claimants. The parties' submissions on these alternatives included substantial evidence on their likely benefits as well as on the potential costs of implementing them.
 
 
 9
 The district court, in a thorough and well-reasoned opinion, weighed four factors to determine whether section 237 strikes a "reasonable balance."[3] R.220 at 21. In the court's view, three of these factors weighed in favor of a determination that the current system was not compatible with the "when due" clause of the federal statute. First, the court found that the number of additional claimants who would be eligible under an ABP system represented a significant increase. The evidence indicated that, in a given year, between 13,800 and 40,000 members of the plaintiff class would be eligible for benefits if lag quarter wages were considered. Second, the amount of additional benefits, $30 million to $40 million per year, that IDES would pay out under an ABP system would be a "dramatic increase in financial benefits to unemployed persons." Id. at 23. Finally, the parties stipulated that the adoption of an ABP in Illinois would speed the payment of benefits to those claimants whose benefits are delayed under the present system. The court found that an ABP system results in prompter payments to lag-quarter eligible claimants and to filing-quarter eligible claimants. On average, the ABP would result in a lag-quarter eligible claimant receiving his benefits 45 days earlier than under the current system. In the most extreme cases, a claimant would receive benefits 12 weeks earlier under an ABP than under section 237's base period.
 
 
 10
 The final factor, the costs to IDES to implement an ABP, favored, in the view of the district court, the position of Illinois that these alternatives were not feasible. In determining these costs, the court relied on IDES' cost estimates. It did so for two reasons. One, it found IDES' evidence on costs more credible. Two, it believed that accepting the highest cost estimates proffered demonstrated most clearly whether the additional benefits gained from moving to an ABP outweigh the costs of that move. IDES had estimated that it would incur a one-time cost of approximately $13.5 million for computer conversion and additional staff. It also estimated that the ABP would cost an additional $2.6 million annually. These expenses would come at a time, according to the district court, when IDES already would face budgetary constraints.
 
 
 11
 The court concluded that, although the additional costs to IDES would be great, the benefits to the plaintiffs "clearly outweigh the costs to IDES." R.220 at 25. Thus, the court reasoned, "section 237 violates the 'when due' clause because it does not insure the greatest promptness in paying unemployment insurance benefits that is administratively feasible." Id. The district court therefore enjoined IDES permanently from applying section 237 to the plaintiff class.
 
 
 12
 Finally, pursuant to our direction in Pennington I, the district court did not adopt as a remedy either of the alternatives suggested by the plaintiff class. The determination of what system ought to be implemented is the prerogative of the State of Illinois. See 22 F.3d at 1388.
 
 II
 DISCUSSION
 A.
 1.
 
 13
 Because this is an appeal in a case that we remanded in Pennington I, it is governed by the law of the case established in that first appeal. The law of the case doctrine "limits redetermination of rulings made earlier in the same lawsuit." Rekhi v. Wildwood Indus., 61 F.3d 1313, 1317 (7th Cir.1995) (emphasis omitted) (citing Christianson v. Colt Indus. Operating Corp., 486 U.S. 800, 816, 108 S.Ct. 2166, 2177-78, 100 L.Ed.2d 811 (1988)). Therefore, the matters decided in Pennington I become the law of this case to be followed in this appeal "unless there is a plain error of law" in our earlier decision.[4] Rothner v. City of Chicago, 929 F.2d 297, 301 (7th Cir.1991). Although not a straightjacket, Avitia v. Metropolitan Club, 49 F.3d 1219, 1227 (7th Cir.1995),[5] the doctrine is not to be set aside or disregarded lightly. It is " 'based on the salutary and sound public policy that litigation should come to an end.' " Rothner, 929 F.2d at 301 (quoting Shakman v. Dunne, 829 F.2d 1387, 1393 (7th Cir.1987) (internal quotation and citation omitted), cert. denied, 484 U.S. 1065, 108 S.Ct. 1026, 98 L.Ed.2d 991 (1988)). There is no justification to deviate from the law of the case doctrine here.
 
 2.
 
 14
 We turn to the applicable standards of review. We review findings of historical fact by the district court under the clearly erroneous standard. However, there is no real dispute between the parties as to the historical facts of the case. As IDES notes in its brief, the majority of the evidence presented to the district court was undisputed by the parties or was the subject of stipulation. The principal area of factual disagreement, the comparative costs of alternates to the current program, was determined in favor of IDES by the district court. To the extent that the submissions of the parties require us to determine whether the district court, in formulating a methodology for its inquiry, correctly interpreted the mandate of Pennington I, the question is one of law, and our review is de novo.[6] Finally, we must evaluate the district court's use of that methodology by its application of the facts of the case to the legal standard we enunciated in Pennington I. Our review of the district court's assessment of the facts in light of those legal standards is subject to deferential review.[7]
 
 3.
 
 15
 Our directions to the district court were plain. Our remand required the court to determine "whether section 237 insures the greatest promptness in paying unemployment benefits that is administratively feasible, making all factual findings that it deems necessary to the resolution of that issue." Pennington I, 22 F.3d at 1388. To make this determination, we held that it was necessary for the district court "to decide whether section 237's base period strikes a reasonable balance between the plaintiff class's interest in prompt payment of unemployment insurance benefits and the state's interest in minimizing the costs of eliminating delay and in preventing fraudulent claims." Id. at 1387 (internal quotation and citation omitted). In formulating this direction to the district court, we, in turn, were obliged to follow another mandate--the mandate of Congress as interpreted by the agency charged by law with the administration of the statute.[8] As we noted in Pennington I, federal law requires that state unemployment benefits be determined under a system that is "reasonably calculated to insure full payment of unemployment compensation when due." 42 U.S.C. § 503(a)(1). In fulfilling his own responsibilities to administer this statutory directive, the Secretary has interpreted this statutory mandate to require the states to adopt methods of administration that will reasonably insure that benefits to eligible claimants are paid "with the greatest promptness that is administratively feasible." 20 C.F.R. § 640.3(a).[9] The Secretary has further noted that "implicit in prompt performance with respect to benefit payments is the corresponding need for promptness by the State in making determinations of eligibility." 20 C.F.R. § 640.1(a)(2).
 
 
 16
 Given the deference that we owe the Secretary's interpretation of the statute which he is charged with administering, these regulatory directives were the foundation of our direction to the district court. Fundamentally, the judicial task is to determine whether the defendant has fulfilled the statutory duty of implementing a system that ensures the payment of compensation with the "greatest promptness that is administratively feasible." 20 C.F.R. § 640.3(a). We therefore required the district court to examine the evidence and to determine whether the Illinois scheme strikes a reasonable balance between the plaintiff class' interest in prompt payment and the state's interest in minimizing the costs of delay and in preventing fraudulent claims. The Secretary's regulations provide some guidance in this endeavor. But they could provide a great deal more, and perhaps they should. This determination of whether to provide more explicit guidance, however, is not ours to make; it is reserved for the Secretary and the Congress in its oversight of his administration of the statute. We must work with the tools that have been given us and remember that our ultimate task is to determine the will of Congress and to see that it is fulfilled by the litigants before us.[10]
 
 B.
 
 17
 We do not believe that the methodology employed by the district court was infirm. The district court noted explicitly that its task was to determine whether the current Illinois system struck a reasonable balance between the interest of the class members in prompt payment and the interest of the state in determining eligibility without incurring unreasonable costs of administration or in preventing fraudulent claims. As the district court noted, the parties agree that, in order to achieve that objective, the court needed to weigh the increase in the benefits that would be paid to members of the class (both in terms of increased dollar amounts and in increased recipients) against the increase in costs of administration to the State in implementing and operating such a system. We think that the district court correctly determined that, to accomplish this task, it needed to consider the availability of alternate schemes and to determine whether those schemes provided a more favorable balance between the number of benefit recipients and the amount of benefits received, on the one hand, and the cost inherent in the administration of such a plan, on the other. IDES never satisfactorily explains how the district court could have accomplished its ultimate objective of determining whether the present Illinois scheme was compatible with the intent of Congress without undertaking such a comparative analysis. Nor do we believe that the district court impermissibly deviated from its assigned task in the course of making this comparison. A reading of the district court's order in its entirety makes clear that it understood its objective: to determine whether the Illinois scheme comported with the demands of the statute and regulations. The court carefully compared the capacity of the current system to fulfill the command of the statute against the capacity of available alternatives to achieve the same goal. It found the present scheme wanting.
 
 
 18
 In its submission before us, IDES claims that the district court did not give adequate consideration to the drawbacks of the alternative systems. In assessing this criticism, we must remember that the district court was obliged to focus upon only those factors that helped it assess whether the alternate scheme in question produced prompter payment in an administratively feasible manner. It is clear that the court did consider those drawbacks which were relevant to the task before it--the comparative financial burden on the state from the administration of each system.[11] The issue before the court was not whether IDES had a preference for a particular system for reasons unrelated to the statutory mandate; the issue was whether the current method of eligibility determination fulfilled the command of the statute. The district court properly limited its focus to whether the alternates resulted in the prompter payment of compensation to which the recipients have a right and whether the plan was administratively feasible. The statutory command of the SSA was the sole and appropriate focus of the court's inquiry. There is, therefore, no merit to IDES' argument that the alternates suggested by the plaintiff class ought to be rejected because they produce a paper delay that is longer than the paper delay caused by the current system. The district court quite properly focused on the actual delay in the receipt of benefits under each method and determined that there was less delay under the alternative scheme.
 
 
 19
 Upon examination of the district court's order, the record and the briefs of the parties, we must conclude that the district court correctly implemented our mandate. After a careful assessment of the evidence, it determined that the current Illinois scheme for determining unemployment eligibility does not fulfill the statutory mandate as interpreted by the Secretary. Given the existence of alternatives that deliver prompter payment without creating significant administrative burdens, the deprivation of compensation, which under the law the recipients are entitled to receive "when due," cannot be justified.
 
 Conclusion
 
 20
 Accordingly, the judgment of the district court is affirmed.
 
 
 21
 AFFIRMED.
 
 
 
 *
 This successive appeal was heard by the original panel pursuant to Operating Procedure 6(b)
 
 
 [1]
 Lynn Doherty replaced Loleta Didrickson as the Director of the Illinois Department of Employment Security ("IDES")
 
 
 [2]
 A "benefit year" is the one-year period beginning on the first day of the week in which the individual first files a valid claim for benefits. 820 ILCS 405/242
 
 
 [3]
 The district court also examined another factor that we had indicated ought to be considered in its determination: whether a change to a different system would increase the number of fraudulent claims. The court determined that this factor ought not play a significant role in its analysis. IDES did not argue on remand that adopting an ABP would necessarily lead to an increase in the number of fraudulent claims. Rather, it contended that certain methods of implementing an ABP carry with them risks of increased fraud. Therefore, the district court did not consider the threat of increased fraud within the system to be a prominent term within its equation
 
 
 [4]
 A panel in a successive appeal may re-examine its previous decision if it has a "strong and reasonable" conviction that its earlier decision was wrong and if the change would not cause undue harm to the party who had previously benefitted from its ruling. Avitia v. Metropolitan Club, 49 F.3d 1219, 1227 (7th Cir.1995) (citing Arizona v. California, 460 U.S. 605, 618 n. 8, 103 S.Ct. 1382, 1391 n. 8, 75 L.Ed.2d 318 (1983))
 
 
 [5]
 Two further exceptions justify a court's divergence from the law of the case: if the evidence adduced in a second trial is substantially different from that of the first trial and if controlling authority has established a contrary ruling of law. Rothner, 929 F.2d at 301 n. 6. Neither of these exceptions is applicable to this case
 
 
 [6]
 See United States v. Townsend, 73 F.3d 747, 754 (7th Cir.1996) (stating that "question whether the district court considered the appropriate factors" in reaching a legal conclusion is reviewed de novo); In re Love, 957 F.2d 1350, 1359 (7th Cir.1992) (stating that correctness of district court's methodology in assessing facts is a question of law); Harman v. Lyphomed, Inc., 945 F.2d 969, 973 (7th Cir.1991) (stating that de novo review is appropriate in reviewing the district court's methodology); cf. Pullman-Standard v. Swint, 456 U.S. 273, 287, 102 S.Ct. 1781, 1789, 72 L.Ed.2d 66 (1982) (noting that district court's findings that rest on an erroneous view of the law may be set aside on that basis); FDIC v. Bierman, 2 F.3d 1424, 1431 (7th Cir.1993) (stating that questions of law are reviewed de novo)
 
 
 [7]
 See Cooter & Gell v. Hartmarx Corp., 496 U.S. 384, 401-05, 110 S.Ct. 2447, 2458-61, 110 L.Ed.2d 359 (1990) (stating that mixed question of law and fact should be reviewed for an abuse of discretion); Pierce v. Underwood, 487 U.S. 552, 559-61, 108 S.Ct. 2541, 2547-48, 101 L.Ed.2d 490 (1988) (same); Carle Found. Hosp. v. Shalala, 57 F.3d 597, 599 (7th Cir.1995) (noting that mixed question of law and fact is reviewed in a deferential manner--"whether the initial decisionmaker is a district court or an administrative agency") (internal citations omitted); G.J. Leasing Co. v. Union Elec. Co., 54 F.3d 379, 382 (7th Cir.1995) (stating that mixed questions of law and fact set aside on appeal only if clearly erroneous); Bierman, 2 F.3d at 1432 (noting that the clearly erroneous standard is well established in this circuit's appellate review of mixed questions). But cf. In re Krehl, 86 F.3d 737, 742 (7th Cir.1996) (noting the possible effect of Ornelas v. United States, --- U.S. ----, ---- - ----, 116 S.Ct. 1657, 1662-63, 134 L.Ed.2d 911 (1996), on some mixed questions beyond the Fourth Amendment context). We note further that after Ornelas the preferable term for the standard of review of mixed questions in these contexts appears to be abuse of discretion because " '[c]lear error' is a term of art derived from Rule 52(a) of the Federal Rules of Civil Procedure, and applies when reviewing questions of fact." Ornelas, --- U.S. at ---- n. 3, 116 S.Ct. at 1661 n. 3
 
 
 [8]
 See Connecticut Dep't of Income Maintenance v. Heckler, 471 U.S. 524, 532, 105 S.Ct. 2210, 2214-15, 85 L.Ed.2d 577 (1985); Unemployment Compensation Comm'n v. Aragon, 329 U.S. 143, 153-54, 67 S.Ct. 245, 250, 91 L.Ed. 136 (1946); Wilkins v. Sullivan, 889 F.2d 135, 139 (7th Cir.1989). See generally Chevron, U.S.A. v. Natural Resources Defense Council, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)
 
 
 [9]
 The Secretary's interest in prompt payment is supported by the congressional intent and the legislative history of the SSA. The Supreme Court, in California Dep't of Human Resources Dev. v. Java, stated that the "objective of Congress was to provide a substitute for wages lost during a period of unemployment not the fault of the employee." 402 U.S. 121, 130-31, 91 S.Ct. 1347, 1353-54, 28 L.Ed.2d 666 (1971). The Court recognized that, although "probably no program could be devised to make insurance payments available precisely on the nearest payday following the termination," that result was the goal of Congress. Id
 
 
 [10]
 See Marlowe v. Bottarelli, 938 F.2d 807, 812 (7th Cir.1991) ("Intent is, of course, at the heart of the judicial inquiry because the courts endeavor to give effect to the designs of Congress and the agencies to which the legislature has delegated authority. In discerning intent, courts traditionally focus on the language of statutes and regulations because we presume that legislatures and agencies mean what they say ....") (internal citations omitted); United States v. Markgraf, 736 F.2d 1179, 1182 (7th Cir.1984) ("Our task, then, is the same as it is in any case involving statutory interpretation: to determine congressional intent. In determining this intent, courts customarily look to several factors: the language of the statute; the legislative history; and the interpretation given by the administrative agency ...."), cert. dismissed, 469 U.S. 1199, 105 S.Ct. 1154, 84 L.Ed.2d 308 (1985)
 
 
 [11]
 As noted earlier, see supra note 3, the district court also recognized the relevance of a comparison of the number of fraudulent claims in each system, but it was not presented with evidence that an ABP system would increase fraud